THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIE TAYLOR, Defendant-Appellant.

(No. 54856;

First District—June 27, 1972.

344

Gerald W. Getty, Public Defender, of Chicago, (Michael Weininger and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and Larry S. Boress, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE SCHWARTZ delivered the opinion of the court:

At 12:30 P.M., on December 27, 1968, an object came through the window of a bedroom in the home of Willie and Burnette Taylor at 5029 West Monroe Street, Chicago. The object exploded and caused a fire. Five persons were in the home at the time—defendant's wife, Burnette Taylor; his stepdaughter, Faye Wright; his stepsons, Orgee Wright and Raymond Smith; and Raymond's wife, Gloria Jean Smith. Orgee Wright

died and Raymond Smith sustained serious injuries as a result of the fire. The defendant was indicted for the murder of Orgee Wright, and for attempted murder, aggravated battery, and arson. Suspicion was directed against the defendant because there had been quarreling between him and his wife, and she had advised the police that he had threatened to blow up the house.

Before going to trial, defendant moved to suppress a confession he had made, and a hearing was had. The court denied the motion and the case went to trial. Defendant's confession was admitted into evidence during the course of the trial, and the jury found him guilty of arson, but he was acquitted of the other charges against him. The court entered judgment on the conviction and sentenced the defendant to serve 25 to 50 years in the State penitentiary. Defendant appeals, contending:

(1) that he was denied due process of law in that his confession which was induced by false statements of the police was admitted into evidence;

(2) that under the Fourth Amendment of the Federal Constitution his confession, which he charges was a product of a custodial interrogation on less than probable cause, was admitted into evidence;

(3) that he was denied his right against self-incrimination when interrogation continued after he had invoked his right to remain silent and resulted in a confession;

(4) that he was denied a fair trial and the right to cross-examine a witness in that he was not allowed to use the witness' prior statement for impeachment purposes;

(5) that he was denied the right to cross-examine a witness who was allowed to testify that the fire in question was "arson," when that was the issue the jury was to decide, and that he was not allowed to inquire into the witness' understanding of the word [arson];

(6) that the evidence was not sufficient to prove the corpus delicti; and

(7) that the sentence was excessive.

At noon on December 27, 1968, the defendant was picked up by police at his place of employment—without a warrant—for questioning about the fire. He was taken to the Town Hall Police Station at 3600 North Halsted Street in Chicago, where the arresting officer asked him some questions in order to complete the arrest slip, then advised defendant of his rights. Defendant was then put into a cell where he remained for two and one-half hours, after which he was taken to Area 5 Headquarters at 2138 North California Avenue. Starting at about 3:00 P.M., the defendant was questioned by three Chicago police officers, Robert Moravec, George Berndt and Robert Walter. At the hearing on the pre-trial

motion to suppress, defendant testified that he was not warned of his rights before the interrogation started, but the officers testified to the contrary.

Defendant was questioned by Detective Moravec for about an hour in the main room of the station, but denied any knowledge of the fire in his home or participation in the incident. He was then moved to a smaller room because there was noise and disturbance in the main room. The second interrogation lasted about an hour and defendant persisted in his denial of any knowledge of or participation in the fire. During that time he was offered food and drink which he refused. He was then moved to the interrogation room where he was questioned by the three officers for about an hour and a half, during which defendant persisted in his denial of any knowledge of or participation in the fire.

During this third interrogation the detective suggested that defendant take a polygraph [lie detector] test. The officers testified that they told defendant the test was voluntary; that the results were inadmissible in court; that it was one way for him to clear himself; and that at no time was he ordered to take the test. The defendant testified that he was told by the officers that taking the polygraph test was the only way they would believe he was telling the truth, that they suggested he take the test, and that he was not told that he did not have to take it.

The defendant then agreed to take the test, and was taken to the Police Crime Laboratory at 11th and State Streets. When he arrived there with the three detectives at 6:00 P.M., Detective Berndt advised the polygraph examiner, Bruce Thompson, of the facts of the crime and the defendant's denial. Thompson then questioned the defendant for half an hour prior to the actual polygraph test, and defendant continued to deny any knowledge of the fire. Thompson told the defendant that most people who take the test are shown to be telling the truth. However, on cross-examination at the hearing on the motion to suppress the confession, Thompson stated that there was no way to measure the results of such a test as to the general truth or falsity, only the truth or falsity of answers to specific questions. At the conclusion, Thompson told defendant he did not pass the test and that there were questions which he did not answer truthfully.

Thompson testified that after he told defendant he had not passed the test, defendant stated he might as well tell the truth because he had not been able to sleep, thinking of what he had done. The witness stated the defendant then related the story of how the fire was set and how he hired someone to set it. Thompson further testified that he then informed the three detectives that defendant wanted to talk to them, and the officers accompanied Thompson back into the testing room. The de-

fendant then gave an oral statement, admitting that he paid a man to throw a bomb into his bedroom window to scare his wife. The detectives took the defendant back to Area 5 Headquarters where they took his written statement confessing to the crime as he had in his oral statement. Defendant's motion to suppress the confession was denied, and he was tried and found guilty of arson.

At the trial, Burnette Taylor, her daughter Faye, and Gloria Jean Smith testified that the defendant threatened, both in person and over the telephone, to burn the house and its occupants. Defendants denied making these threats and testified that on the evening of the fire he was drinking with his cousin, William Harris.

Faye Wright testified that she made a statement to the Assistant State's Attorney the day before she gave her testimony. She further stated that he was taking notes during her conversation with him. Defense counsel asked to see the notes, but the court sustained prosecution's objection and refused to allow the defense to examine the notes. The testimony of Faye Wright was in corroboration of the threats to which defendant's wife testified.

An arson investigator, Chicago Police Officer Webb Threet, appeared for the State as an expert and testified that he had investigated over a hundred fires. The court allowed him to state his opinion that the fire in question was classified as "arson." Defense counsel was not permitted to cross-examine the witness as to whether an intentional act was included in his characterization of the fire as "arson."

The jury found the defendant guilty of arson, but not guilty of murder, attempted murder, and aggravated battery. The court held a hearing in aggravation and mitigation and sentenced defendant to serve 25 to 50 years in the State penitentiary. We proceed to a consideration of defendant's first contention that he was denied due process of law in that his confession, which he charges was induced by false statements of the police, was admitted into evidence.

Defendant argues in support of his contention that his will was "overborne" (see *Culombe v. Connecticut* (1968), 367 U.S. 568) by the false assertions of the police that the polygraph test was the only way to prove his innocence and that he had better tell the truth. He further argues that these assertions, coupled with the statement by police that he did not pass the test, destroyed his "self-direction" (*Culombe, supra*) and compelled an involuntary confession.

■■ Before a confession is admitted into evidence the State must prove by a preponderance of the evidence that it was voluntary. (*People v. Harper,* 36 Ill.2d 398.) If the confession is involuntary the conviction cannot stand. (*Payne v. Arkansas* (1958), 356 U.S. 560.) The court must

look at the totality of the circumstances in determining the legal voluntariness of a confession under the due process clause. *People v. O'Leary,* 45 Ill.2d 122; *Fikes v. Alabama* (1957), 352 U.S. 191; *Culombe v. Connecticut, supra.*

At the pre-trial hearing on the motion to suppress the confession the State presented testimony of each of the three detectives who questioned the defendant. They testified that they made no promises or inducements to defendant which would encourage him to confess, that he was offered food and drink during the interrogation, and that he was advised of his constitutional rights and indicated that he understood those rights. Detective Moravec testified that the defendant was told he could take a lie detector test if he so desired, but that such a test was completely voluntary; that any of the results were inadmissible in court, and that the test was one way to clear himself if he had nothing to do with the crime.

Bruce Thompson testified that before administering the test he told defendant he did not have to take the test, and that he had a right to have an attorney. Thompson further testified that the defendant read and signed a waiver of liability before taking the test. Thompson also testified that after the test he informed the defendant he had failed to pass it, and that defendant then admitted he had paid a man to set the fire.

The defendant testified that he was arrested, taken to the police station, not warned of his rights, and told by police officers that if he did not tell them the truth he would be put in jail for a long time where he would be subject to homosexual attacks. Defendant further testified that he was told the lie detector test was the only way to prove his innocence, and that he was not told that the results of the test were not admissible in court. He stated he was told by the test examiner that he failed the lie test and that the police were "mad at him." It was stipulated that if the examiner, Thompson, were recalled as a witness he would testify that he told the defendant he had better tell the story to protect himself.

■■ From the conflicting testimony the court found the confession voluntary. The issue decided by the trial court was one involving the credibility of witnesses, which is for the trier of fact to determine. Such a finding, unless contrary to the manifest weight of the evidence, will not be disturbed by a reviewing court. (*People v. McGuire,* 39 Ill.2d 244, *cert.* den. 393 U.S. 884.) Hence, a finding of voluntariness will not be disturbed unless it is contrary to the manifest weight of the evidence or an abuse of the trial court's discretion. *People v. Nicholls* (1969), 42 Ill.2d 91, *cert.* den. 396 U.S. 1016; *People v. McGuire, supra.*

■■ In the case before us the defendant was warned of his rights, was not questioned continuously for an extended period of time, was offered

food and drink, and stated that he understood he did not have to take the polygraph test. After being told he had failed to pass the lie test, the defendant confessed to the crime. Considering all the facts, it is our conclusion that defendant's confession was voluntary and not induced by false assertions of the police.

Cases cited by the defendant are not applicable to the case at bar. In *Watts v. Indiana* (1948), 338 U.S. 49, the defendant was held without arraignment and without a lawyer for six days, placed in a cell without a seat or a bed for the entire period, and interrogated by police officers well past midnight each night. Defendant also relies on *People v. Sims*, 395 Ill. 69. In that case the defendant, a 17-year-old girl, asked to speak to her lawyer and refused to take a lie detector test. She was attached to a polygraph and confessed before the machine was in operation, but refused to sign the statement she had made. In both *Watts* and *Sims* it was held that the confessions were involuntary and not products of the defendants' free will. The facts in those cases involve an accused who was unwilling to talk and was subjected to certain treatment designed to elicit a confession. In the instant case, however, the officer did not engage in conduct even remotely similar to *Watts* or *Sims*. Using the factual background of *Watts* and *Sims* as standards to judge the conduct of the officer in the instant case, we hold that the defendant's confession was not coerced by police, but was the product of his own free will.

In the instant case we do not have a "protracted, systematic and uncontrolled subjection of the accused to interrogation by the police * * *." as in *Watts v. Indiana, supra*, at page 55. There was no coercion by police officers, and the mental pressure resulting in the confession came from within the defendant himself. In this case the police acted as a "midwife to a declaration naturally born of remorse or relief * * *." *Culombe v. Connecticut, supra*, at 576.

■■ Defendant next contends that he was denied his rights under the Fourth Amendment when his confession—which he charges was a product of "custodial interrogation on less than probable cause"—was admitted into evidence. In *People v. Peak*, 29 Ill.2d 343, at page 348, the court said:

"Probable cause for arrest exists when the facts and circumstances within the arresting officer's knowledge, and of which he had reasonable and trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in believing that an offense has been committed, and that the person arrested is guilty."

In the case before us the arresting officer was given information over the police radio to the effect that the defendant was wanted for investigation of arson, and was given defendant's name, description, and place

of employment. These details furnished by police radio can be taken as reasonably trustworthy information on which an officer can base his actions *Klingler v. United States* (8 Cir. 1969), 409 F.2d 299.

■■■ The details furnished the arresting officer came from Detective Moravec who had interviewed defendant's wife and learned of the defendant's threats to set the house on fire. When officers are working together the arresting officer has the right to rely on the knowledge of the officer giving the order. (*People v. Peak, supra.*) Considering the facts given by defendant's wife to Detective Moravec, a police investigation of the fire required that the defendant be picked up and questioned.

■■ Defendant next contends that he did not voluntarily waive his privilege against self-incrimination and that he was denied that right when he was questioned after he had remained silent. He argues that he was warned of his constitutional rights, understood them, and then denied participation in the crime, or remained mute, and that only after being tricked by the false promises regarding the possible results of the lie detector test, did he confess. He contends that this was not a voluntary waiver. The record shows that defendant was warned of his rights several times and that on at least two occasions he expressed his understanding of those rights. He further expressed an understanding of these rights when questioned by the polygraph examiner. The fact that defendant stated he was willing to make a statement, that he was warned of his rights, understood them, and did not ask for an attorney, establishes that he voluntarily waived his privilege against self-incrimination.

■■■ Defendant argues that when he chose to remain silent after the initial questioning by police, he was in fact invoking his right to remain silent, and that the confession elicited after the initial silence violated his right against self-incrimination. The initial silence of an accused does not foreclose police from questioning. Undoubtedly, a suspect can change his mind and choose to speak after first remaining silent. (See *United States v. Brady* (2 Cir. 1970), 421 F.2d 681.) If the defendant had stated that he wanted a lawyer, or that he did not want to talk, or that he was invoking his rights, he would have indicated his intention to remain silent and interrogation should then have ceased. He did not, however, indicate his intent not to speak, but first stood mute and then chose to speak. His initial silence was not an exercise of his right to remain silent, but an initial reaction which changed when he decided to confess.

■■ Defendant next contends that he was denied his right to cross-examine a witness when he was not allowed to use the witness' prior statement for impeachment purposes or to examine the statement himself. Faye Wright, a State's witness, testified that the day before she

was to testify she had spoken with Assistant State's Attorney Serpico concerning what her testimony would be at trial, and that he was taking notes during the conversation. Serpico admitted that he was taking notes, but refused to give them to the defendant and claimed they were "work product." The case of *People v. Dennis,* 47 Ill.2d 120, is controlling here. The complaining witness there testified that he had a conversation with police at which time he gave a description of the offenders, and that while he was talking the police officer was writing. The witness could not see the writing and could not tell what was written during the interview. The State's Attorney admitted the existence of the notes but advised the court that the notes did not contain statements of the witness. The court stated at page 129 that it was "thus incumbent upon the defense to establish as a prerequisite to production of a possibly impeaching statement that it not only exists but is rendered in 'the witness's own words or substantially verbatim.'"

In the case before us the witness did not testify that she gave or signed a statement the day before her testimony, and there is nothing in the record which establishes that Serpico's notes were a substantially verbatim copy of the conversation with the witness. The defendant thus failed to establish one of the prerequisites for production of the statement and, accordingly, was not denied his right to cross-examine a witness.

Defendant next contends that he was denied his right to cross-examine a State's witness when the court refused to allow his cross-examination of the witness on his understanding of the word "arson." The witness, Chicago Police Officer Webb Threet, who was assigned to investigate fires, testified as an expert on purely scientific evidence obtained from his investigation of the fire. He testified that the fire was incendiary in nature, brought about by a chemical accelerant, and was professionally classified as arson.

■■ On cross-examination defendant asked the witness, Officer Threet, if his definition of arson included the intentional action of a human being. The court sustained the State's objection to that question on the ground that it called for a legal conclusion since the answer was a scientific classification unrelated to any intent with respect to the setting of the fire. The witness did testify that he believed the fire was the result of other than natural causes and that he thought the fire was intentional because of the fact that there were two separate fires which broke out in the same room. If it was error not to allow the defendant to ask the witness whether his definition of arson included the intentional act, this error was rendered harmless by the subsequent cross-examination in

which Officer Threet indicated that in his opinion the fire was intentional. The defendant's right to cross-examination was not impaired, as he elicited from the witness his expert opinion of the cause and nature of the fire. The jury, as trier of fact, could determine from Officer Threet's testimony and from the other evidence and testimony, whether the element of intent was present.

■■ Defendant next contends that the evidence was insufficient to establish the *corpus delicti*. Defendant argues that there was no corroboration of defendant's confession; hence, the confession standing alone was insufficient for a conviction. If there is corroborative evidence to support the confession, both evidence and confession can be considered, but if there is no corroborative evidence, a defendant's confession standing alone is not sufficient to support a conviction. *People v. O'Neil*, 18 Ill.2d 461.

■■ To prove the *corpus delicti* in an arson case, two elements are necessary: 1) that the burning of a building occurred; and 2) that someone is criminally responsible for the act. (*People v. Lueder*, 3 Ill.2d 487; *People v. O'Neil, supra.*) Defendant argues that the second element is not corroborated by any evidence. There was corroborative evidence that defendant was responsible for the fire in the threats he made to "blow up the house." These threats were testified to by three witnesses, and the last threat was made the evening before the fire. There is no corroborative evidence for the fact that defendant hired another man to set the fire, but the threats were sufficient corroboration to establish defendant's criminal responsibility. Undoubtedly, one who hires another to start a fire is criminally responsible for that fire, and the threats in the instant case are corroboration for the element of criminal responsibility. In addition, there was no evidence to substantiate defendant's alibi. The testimony of defendant's wife, his stepdaughter and daughter-in-law in regard to the threats he made constitutes sufficient corroborative evidence to allow defendant's confession to be admitted into evidence. The confession and the corroborative evidence prove defendant's guilt beyond a reasonable doubt.

■■ Defendant finally contends that the sentence of 25 to 50 years in the State penitentiary for the crime of arson is excessive. In Illinois, the penalty for arson provides for an indeterminate sentence in the penitentiary with a minimum of not less than one year. This court will not interfere with a sentence imposed by the trial court unless it is manifest from the record that the sentence is excessive and not justified by any reasonable view which may be taken of the record. (*People v. Glasgow*, 126 Ill.App.2d 82; *People v. Jones*, 118 Ill.App.2d 189.) A

penalty imposed by the trial court should not be disturbed unless there are substantial reasons for doing so. *People v. Hanserd,* 125 Ill.App.2d 465.

In the instant case defendant was indicted for murder, attempted murder, aggravated battery, and arson. The jury found him not guilty on all charges except arson, thus finding that defendant intended to burn his home, and in that respect was heedless of what might happen and did happen to his stepson. The State recommended a 25 to 50-year sentence and the court adopted that recommendation.

Defendant offered facts in mitigation. He was 42 years old and had married in 1966. He had worked continuously for the past 20 years with only one period of long lay-off. In 1966 he purchased the house for which he and his wife were paying. He has never been convicted of any serious crime, and the State revealed only one prior offense—a $21.00 fine for drunkenness. The details of that offense were not disclosed. The crime in question was committed by the defendant in a state of violent anger and passion. The minimum sentence of 25 years is in excess of the minimum sentence for murder, which is 14 years. Under the facts and circumstances of this case, we consider the sentence excessive. The judgment of conviction is affirmed, but the sentence is modified to provide for a minimum sentence of 14 years and a maximum sentence of 50 years, to be served in the State penitentiary.

Judgment affirmed as modified.

STAMOS, P. J., and LEIGHTON, J., concur.