THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
BENJAMIN SMITH (Impleaded), Defendant-Appellant.
First District (5th Division)   No. 62499

Opinion filed June 16, 1977.—Rehearing denied July 14, 1977.

James J. Doherty, Public Defender, of Chicago (Diane M. Burick, Robert P. Isaacson, and Richard D. Kharas, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Mary Ellen Dienes, and Paul E. Kelly, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

Benjamin Smith, hereinafter defendant, was charged by indictment with murder (Ill. Rev. Stat. 1973, ch. 38, par. 9—1), and attempted armed robbery. (Ill. Rev. Stat. 1973, ch. 38, par. 8—4.) Defendant was found guilty of both charges in a jury trial and was sentenced on the murder only to not less than 60 nor more than 100 years in the Illinois State Penitentiary.

On appeal defendant makes the following contentions: (1) certain statements made by the defendant should have been suppressed as being the fruit of his unlawful arrest and detention; (2) the testimony of State witness, Michael Warr, should not have been allowed in evidence because his discovery was also the result of the unlawful arrest and detention of the defendant; (3) defendant's statements should also have been suppressed on the independent ground that he did not knowingly waive his right to remain silent since the State did not establish that he was aware of the possibility of adult certification and he was only fifteen when he was questioned; (4) Michael Warr's testimony was inadmissible as the product of statements made by the defendant without a knowing and intelligent waiver of the defendant's right to remain silent; (5) with the exclusion of defendant's statements and Warr's testimony, or even with the exclusion only of defendant's statements, the evidence is insufficient to establish defendant's guilt beyond a reasonable doubt; (6) defendant's sentence was excessive.

We affirm.

On the evening of January 17, 1973, four boys entered the basement of a church located at 104th and Wentworth Streets in Chicago. They asked John Henderson, a church deacon, for candy and when he refused they left. Later two of the boys returned to the basement and announced a "stick-up." Henderson raised a chair to defend himself and was shot and killed by one of the boys. Another deacon, Joel Anderson, witnessed these events. The defendant and Leslie Gills were arrested and charged with the murder and attempt armed robbery of Henderson. Gills subsequently pled guilty and was sentenced to a minimum of 14 years and a maximum of 14 years and one day in the Illinois State Penitentiary.

Prior to trial defendant moved to quash his arrest and to suppress statements allegedly made by him. At that hearing Investigator Victor Tosello testified that on the day of the shooting he interviewed Joel Anderson. Anderson told him he was a witness to the shooting and gave Tosello a description of the assailants. Two days later, January 19, Tosello learned from Henry Harrell that Harrell's brother Darryl had told him that he had seen the defendant, Leslie Gills, and Cedric Webb run from the church at the time of the shooting. When questioned about this, Darryl denied having said it. Tosello then obtained pictures of these three

individuals allegedly seen by Darryl and showed them to Anderson. Anderson picked out pictures of the defendant and Webb, saying that they "resembled" the assailants but he could not be positive. He wanted to see them in person before he stated definitely. At about 1 on the morning of January 20, 1973, Tosello gave a "verbal rundown" of this information to officers on the next watch, including, he believed, Investigator John Yuciatis.

Investigators John Yuciatis and James Davis testified that at about 1 or 1:30 on the morning of January 20, 1973, they were told by other officers that the defendant had been implicated by witnesses in the murder of Deacon Henderson. Davis believed that he had received this information from Tosello. At about 1:30 in the morning they went to the home of Mrs. Margaret Webb with whom defendant apparently resided. Yuciatis told Mrs. Webb that defendant was wanted for questioning concerning a homicide. She got the defendant and the officers then informed him he was a suspect in the murder of Henderson. Davis advised the defendant of his constitutional rights and the defendant said he understood them. They did not tell the defendant he was under arrest, but asked him if he would accompany them to Area 2 headquarters for questioning. Defendant agreed to go. Mrs. Webb was told that she could come along to the station but she did not go there. Defendant was then driven to Area 2. Davis testified that if defendant had tried to leave the car they would have stopped him. At Area 2, located at 9059 Cottage Grove in Chicago, defendant was placed in an interview room and again advised of his constitutional rights by Davis. Defendant again stated that he understood those rights. In response to questioning defendant said he knew nothing about the shooting. Defendant apparently stated that he was 16, though he was actually 15. He was then transported to Area 1 at 51st and Wentworth in Chicago and at about 3 a.m. was placed in a lineup viewed by Anderson. Anderson could not identify the defendant. At the hearing Davis testified that at this point he had no other evidence in his possession that defendant committed the crime. Yuciatis told the defendant he had not been picked out and they would take him back to Area 2 and subsequently bring him home. Defendant was taken back to Area 2 at about 4 a.m. and placed in a room there. Yuciatis testified that at this point Davis told him that he would again ask the defendant if he knew anything before he took him home. He testified that Davis went into the room and asked defendant a few questions. Davis testified that at Area 2 he told the defendant he was going to make up a juvenile arrest report and turn him over to the juvenile authorities free of charges. While Davis was making out the report the defendant volunteered that he had heard that "Mike-Mike and Leslie" were involved in the killing and that they had gotten the gun from Joe Thompson. Davis did not advise defendant of his

constitutional rights at this time. He asked defendant if he would stay and identify the people he had named. Davis then relayed this information to Yuciatis. They decided they would keep the defendant there while they brought in these people so he could identify them. Davis, Yuciatis, and other police officers then arrested Joe Thompson, Michael Warr and Leslie Gills and brought them back to the station at about 5 or 5:30 that morning. Yuciatis questioned Michael Warr, who told him that defendant was the shooter in the murder. Yuciatis informed Davis, who told the defendant of the accusation and advised him of his constitutional rights. Yuciatis testified that it was at this time that defendant was placed under arrest. Defendant then made an oral statement to Davis.

Assistant State's Attorney Frank Carey testified that at about 7:30 that morning he advised defendant of his constitutional rights; defendant said he understood those rights, and Carey then took an oral statement from the defendant.

Mrs. Webb testified that the officers told her they were taking the defendant in for questioning and he could return home afterward. She denied that they had told her she could go down too.

Defendant denied having been given his constitutional rights until after he spoke to the Assistant State's Attorney. He stated that he knew his rights but he was not thinking of them because he was not told he was under arrest. After he was placed in the lineup the officers told him that he was in trouble as "the lady" had identified him. He denied having given the names of people involved in the crime. Only after Investigator Yuciatis slapped him about the face a number of times did he say that he "did it."

The trial court denied defendant's motion to quash the arrest and suppressing his statements, specifically finding that the officers had probable cause to make the arrest and the statements were made voluntarily, without physical coercion or brutality. In his motion, and his arguments in support of that motion, defendant did not specifically raise the issue of whether defendant knew that he might be tried as an adult, therefore the trial court did not specifically make a finding on this question. However the judge did find that the officers were aware that the defendant was at least as young as 16, while also finding that defendant was "precocious" and "aware enough to understand everything being done."

At trial Michael Warr testified for the State that on January 17, 1973, while walking with the defendant he was approached by Leslie Gills and Alphonso Bennett. Gills suggested that they steal the purse of a woman who was across the street. The four then followed the woman into the church at 132 West 104th Street. They didn't see her in the church, but then heard a noise in the basement. At defendant's suggestion they

investigated the noise and encountered Deacon Henderson. Gills asked for candy, was refused, and the four went outside. Bennett told Warr and the defendant to rob the deacon. When Warr declined Bennett pulled out a gun and threatened to shoot him if he didn't. Warr then agreed, and Bennett gave the gun to the defendant. Warr and the defendant re-entered the basement. Defendant pulled out the gun and announced a "stick-up"; Warr started to search Henderson but Henderson pushed his hand away. Leslie Gills then started coming down the stairs to the basement and Henderson started to back away. Gills told the defendant to shoot Henderson. Henderson raised up a chair and the defendant shot him. All four of the youths then fled.

Joel Anderson testified that on January 17, 1973, he was in the basement of the Christian Missionary Baptist Church at 104th and Wentworth in Chicago with Deacon Henderson. Three boys walked in and asked for candy. One of the boys then pointed a gun at Anderson and announced a "stick-up." The men begged them not to shoot, telling them that they had no money. When Deacon Henderson started backing up and picked up a chair the boy behind the one with a gun said "Shoot him." The gun went off and the boys fled.

Assistant State's Attorney Frank Carey and Investigator James Davis both testified that the defendant had admitted to them that he had shot Deacon Henderson during an attempted robbery.

## I.

■■ In his original brief defendant did not specifically contest the sufficiency of probable cause for his initial arrest at the home of Mrs. Webb. Defendant affirmatively stated in his reply brief that this was not an issue. Yet during oral argument before this court defendant sought to raise this issue, alleging that the police lacked probable cause to make the arrest. Although we could properly consider this point to have been waived by defendant's failure to raise it in his original brief (Ill. Rev. Stat. 1973, ch. 110A, par. 341(e)(7)), we nonetheless consider it fully. (*People v. Mackins* (1974), 17 Ill. App. 3d 24, 308 N.E.2d 92, *cert. denied*, 419 U.S. 1111.) Defendant alleges that Joel Anderson's trial testimony indicated that Anderson never identified defendant from photographs. In fact Anderson's trial testimony is ambiguous on this point. Anderson did indicate that he had never identified the defendant. But he was never asked whether he had been shown pictures of the defendant for possible identification. At the hearing on the motion to suppress, Investigator Tosello's clear testimony was that Anderson had picked out a picture of the defendant as being one which "resembled" one of the assailants. Prior to this Tosello was told by Henry Harrell that Harrell's brother Darryl had reported seeing the defendant and two other youths running from the

church at the time of the shooting. Darryl Harrell denied having made this statement, but Officer Tosello nonetheless used this information to select the pictures he showed to Anderson, and Anderson appeared to confirm the truth of this hearsay statement. Just prior to the arrest of the defendant Tosello gave this information to a group of officers which he believed included Investigator Yuciatis. Yuciatis and Davis testified that just before they brought in the defendant they were told by other officers that the defendant had been implicated by witnesses in the murder of Deacon Henderson. Davis "believed" that he had received this information from Tosello, but neither man could definitely recall who had given them this information. It is clear though that the police had knowledge of sufficient facts and circumstances such as to give them a reasonable belief that a crime had been committed and that the defendant had committed it; they therefore had probable cause to make the arrest. (*People v. Robinson* (1976), 62 Ill. 2d 273, 342 N.E.2d 356.) This was true even though this belief was based on evidence which might not have been admissible at trial. (*People v. Marino* (1970), 44 Ill. 2d 562, 256 N.E.2d 770.) They knew that Deacon Henderson was shot and killed during an attempted holdup in a church basement. They had hearsay evidence that Darryl Harrell saw the defendant running from the church right after the shooting. Though Harrell denied having made this statement, they also knew that Deacon Anderson, an eyewitness to the shooting, had tentatively identified the defendant from a photograph as having been involved in the shooting.

It is true that the record is not clear as to whether the arresting officers possessed all of this information. But they were told by other officers that witnesses had implicated the defendant in the shooting. The arresting officers properly relied on the knowledge of the officers giving them this information. That specific information may be imputed to the arresting officers who were involved in the same investigation. (*People v. Taylor* (1972), 6 Ill. App. 3d 343, 285 N.E.2d 489, *affirmed*, 58 Ill. 2d 69, 317 N.E.2d 97; *People v. Brinn*(1965), 32 Ill. 2d 232, 204 N.E.2d 724, *cert. denied*, 382 U.S. 827.) Clearly then the original arrest of the defendant was based on probable cause.

But defendant also contends that once Joel Anderson could not identify him in the lineup, any probable cause which might have existed dissipated and from that point he was illegally arrested and detained. Given this illegal arrest and detention, defendant then argues that the statements he made should have been suppressed as the "fruit" of that illegality.

Defendant does not cite any cases which set out a standard by which the conduct of police may be judged where a defendant is held for some time after the initial probable cause for the arrest has been discredited. The unsupported assertion that the conduct in this case was illegal is of

little use. However, the cases dealing with extended delay in presenting a defendant before a magistrate after his lawful arrest do provide an analogous situation. The arrest is lawful, but subsequent police conduct may create an unlawful detention. What standard is to be used in determining the illegality of a detention? Such a standard was applied in *People v. Nicholls* (1970), 44 Ill. 2d 533, 256 N.E.2d 818. In that case a defendant was arrested at his home on a Saturday afternoon, questioned at police headquarters for one hour, then questioned again that evening in the presence of his wife. He was held the next day without being questioned, but was allowed to see his wife and talk to his attorney. The next day, a Monday, he made several incriminating statements during the day and in the evening. It was not until after he made the last statement that evening that he was arraigned. The court first refused to adopt the federal rule commonly called the McNabb-Mallory rule by which any unlawfulness of detention automatically prevents the admission of a statement made during that detention. It then went on to state: "In any event, the record here does not show any lack of fair play nor such unreasonable or unnecessary delay as to have made defendant's detention illegal within the McNabb rule." This basic test of reasonableness was also invoked in *People v. Johnson* (1970), 44 Ill. 2d 463, 469, 256 N.E.2d 343, *cert. denied*, 400 U.S. 958, where the court stated: "* * * unreasonable delay in presenting a defendant before a magistrate is a circumstance to be taken into consideration in determining whether or not his confession was voluntary." Reasonableness has also been the standard used to judge the admissibility of a statement made while a defendant was held for three hours without allowing someone to release him on bail. *People v. Triplett* (1973), 12 Ill. App. 3d 834, 298 N.E.2d 756.

We do not find the detention of the defendant in the case at bar to have been unreasonable. According to the testimony of Investigators Yuciatis and Davis, which the trial court clearly believed, the initial purpose of the brief detention following the lineup was to fill out juvenile arrest forms pertaining to the defendant and then to either drive the defendant home or release him to the juvenile authorities. While Davis was filling out those forms the defendant volunteered information about participants in the crime. At that point the investigators made a decision to hold the defendant briefly while they brought in these people he had named for his possible identification of them. Defendant was asked if he would stay and do this but the record does not indicate whether he responded to this request. But, given the testimony that he volunteered this information, we deem the decision of the officers to hold him until he could view these people to have been a reasonable one under the circumstances. When one of these individuals then implicated the defendant in the killing the police again had probable cause to arrest and detain the defendant, which they did. Because we have determined that the defendant was not illegally

detained, we need not discuss the effect of such an illegal detention on the admissibility of the defendant's subsequent statements.

## II.

■■ Defendant asserts that the State did not establish the voluntariness of his statements because they failed to prove that he made them with knowledge that he could be tried as an adult. In doing so they rely on the case of *People v. Prude* (1975), 32 Ill. App. 3d 410, 336 N.E.2d 348. The appellate court for the fifth district did hold in *Prude* that for the statement of a juvenile to have been admissible in a criminal proceeding it must have been established by a preponderance of the evidence that the juvenile made the statement with the knowledge that he might be tried as an adult in a criminal prosecution. This could be established, the court held, by an explicit warning given to the juvenile or by proof of his general awareness such as by previous exposure to the criminal justice system. However, on appeal to the Illinois Supreme Court this ruling was reversed. (*People v. Prude* (1977), 66 Ill. 2d 470. In that opinion our Supreme Court reaffirmed that in determining the voluntariness of a confession the totality of the circumstances rather than any one factor should be considered. While recognizing that great care must be taken to be certain that the confession of a juvenile was given voluntarily, the court held that "[T]he circumstance that an accused is a juvenile does not of itself require that he be advised he may be prosecuted as if he were an adult before he may knowingly waive his right to remain silent." (66 Ill. 2d 470, 476.) In *Prude* the 16-year-old defendants were arrested and questioned in connection with a shooting. They were advised of their *Miranda* rights and indicated that they understood those rights. However, they were not told that their alleged victim had died and that they were under suspicion of murder. They both signed juvenile waiver statements which included warnings only as to possible sanctions which a juvenile court could impose. Nonetheless, the court found that the defendants knowingly and intelligently waived their rights to remain silent and voluntarily gave their confessions. In so finding the court pointed to the following factors: defendants were given *Miranda* rights which they had indicated they understood; there was nothing to suggest they were of less than normal intelligence; both had previous experience with the police— one had been adjudicated a delinquent and placed on probation and the other had been arrested and charged with robbery but then released; both were aware that they were suspects in a serious offense, armed robbery, though they were not aware that a possible murder charge was also involved; finally, they were clearly being questioned in an adversary setting by police. Under these circumstances the court found that "An awareness of potential criminal responsibility * * * could properly be imputed to the defendants." (66 Ill. 2d 476, 477.) Similarly, in the case at

bar, according to police testimony which the court clearly believed, the defendant was given his *Miranda* rights on four different occasions, and each time stated he understood those rights; he was aware that he was a suspect in a murder investigation; he was 15 years old and no evidence indicated he was of less than normal intelligence; and his questioning took place in an adversary setting and was conducted by police. He was not given any juvenile waiver statements which might have misled him. He was only informed that since he had not been identified he would be turned over to the juvenile authorities after the police filled out a juvenile arrest report. This circumstance could not be considered to have misled the defendant, especially when it is compared to the juvenile waiver form in *Prude* which the court found did not induce those confessions. We therefore find that the defendant's statements were made by him with a knowing and understanding waiver of his right to remain silent and with an understanding of the possibility of criminal responsibility.

Because of our determination of the voluntariness of defendant's statements we need not consider defendant's contention that Michael Warr's testimony should have been suppressed as the fruit of defendant's improperly obtained statements. Nor need we consider defendant's reasonable doubt arguments which are premised on the exclusion of defendant's statements and Warr's testimony.

### III.

Finally defendant contends that his sentence was excessive. At the time of sentencing the defendant was 18 years of age. Defendant had one prior juvenile misdemeanor conviction for the offense of criminal trespass to vehicles; he had no criminal record. The comments of the trial judge before sentencing indicate that the major reason for the severity of the sentence was the nature of the crime. However, the Illinois Constitution requires that "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." (Ill. Const. 1970, art. I, §11.) We believe the effect of the sentence in this case would be to severely reduce the possibility of defendant's rehabilitation. (*People v. Horton* (1976), 43 Ill. App. 3d 150, 356 N.E.2d 1044.) Therefore, under the authority provided by Supreme Court Rule 615(b)(4), the defendant's sentence is reduced to not less than 20 and no more than 40 years in the Illinois State Penitentiary. The judgment is modified to reflect the reduced sentence, and, as modified, the judgment is affirmed.

Affirmed as modified.

DIERINGER, P. J., and LINN, J., concur.