THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* PAUL TEDDER *et al.*, Defendants-Appellants.

First District (5th Division)   Nos. 78-162, 78-163 cons.

Opinion filed April 18, 1980.—Rehearing denied May 16, 1980.

James J. Doherty, Public Defender, of Chicago (Marc Fogelberg, Assistant Public Defender, of counsel), for appellants.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Iris E. Sholder, and Paul D. Kerpan, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Defendants Tedder and Nettles were charged with burglary (Ill. Rev. Stat. 1975, ch. 38, par. 19—1), armed robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18—2) and aggravated battery (Ill. Rev. Stat. 1975, ch. 38, par. 12—4). Their first trial resulted in a mistrial due to improper opening statements by the prosecutor. Following a second jury trial, defendants were found guilty as charged, except Nettles who was found not guilty of aggravated battery. Defendants were sentenced to a term of 6 to 18 years for burglary and 30 to 50 years for armed robbery. Tedder was also sentenced to 3 to 9 years for aggravated battery. Both defendants' sentences were to be served concurrently.

Defendants raise the following issues on appeal: (1) they were denied their constitutional right to the effective assistance of counsel; (2) there was no probable cause for their arrests and the direct and derivative facts of the arrest should have been suppressed; (3) they were denied their constitutional right to a speedy trial; (4) the trial court erred in denying

them use of a composite sketch for impeachment purposes; (5) they were not proven guilty beyond a reasonable doubt; (6) they were denied a fair trial by the prosecutor's closing arguments; and (7) their sentences for armed robbery are excessive.

On August 12, 1976, at about 3:30 a.m., Mrs. Ruth Fruehling was awakened by a loud noise while she was alone in her home at 320 South Greenwood in Park Ridge, Illinois. She got up, turned on a light and walked to the front door to see if it was raining. She then turned on the light at the top of the basement steps and proceeded down the stairs to the basement. Before she reached the bottom of the stairs, the light went out and she was grabbed and told not to scream. When she cried out, she was pistol-whipped across the head for about five minutes which resulted in a deep gash on her forehead.

Defendants then demanded a coin collection which they contended she had previously shown to another lady. When she denied knowledge of any such collection, Tedder, described as the short, muscular defendant, went upstairs to search the house while Nettles, identified as the tall, skinny defendant, remained in the basement with her. When the upstairs hall light was turned on again, Mrs. Fruehling noticed that both men had guns and flashlights and were wearing surgical gloves. She saw their faces because neither man wore a mask. Nettles kept a gun pointed at her for the next 20 minutes. He put his flashlight down on the steps, and it provided additional illumination in the basement. She noticed that Nettles had "deep penetrating eyes," and was wearing round-toed beige earth shoes.

When Tedder, the defendant who beat her, returned, he stood close to her with his gun pointing at her. He was wearing a gray T-shirt with short sleeves and had tattoos on his arms. Tedder asked Nettles what to do with her. Nettles replied, "Do you want to silence her?" Tedder then threatened to kill her if she told anyone about the incident, and the two left through the basement door that they had earlier broken to gain entry. At various times that evening, the face of each defendant had been within nine inches of the face of Mrs. Fruehling.

After they left, Mrs. Fruehling realized that her head was bleeding profusely. She went upstairs to make a telephone call but found that her telephone cord had been cut, her bedroom and dining room drawers ransacked and $117 stolen from her purse. She went to a neighbor's house and called the police. Several stitches were required at the hospital to close her head wound.

On September 21, 1976, Mrs. Fruehling viewed a lineup at the Area 6 police station in Chicago. When the curtains covering the one-way window of the lineup room were opened, she immediately recognized Tedder as the short, muscular intruder, and exclaimed, "Oh, my God.

There's one of them." She then immediately identified Nettles as the tall, skinny intruder. She also identified defendants in court as the intruders in her basement that evening.

On cross-examination, Mrs. Fruehling recalled that she described the two assailants to Park Ridge policemen. One of the police officers had an "Identi-Kit," *i.e.*, a sketch composed of various features of the human face. She admitted that she told the police officer that the eyes, ears, lips and nose of the two intruders were not similar. She further admitted that her observations of Tedder's tattoos on direct examination differed from her testimony at the preliminary hearing, where she stated that she saw no marks on his arms. As to Nettles, she testified that on one occasion during the night of the crime, he held a small white card in front of his face in an attempt to mask his identity.

Detective Frank Koehler, a Chicago policeman had learned of the August 12, 1976, home invasion and had a physical description of the assailants. He and four other Chicago policemen arrested defendants on September 21, 1976, as they emerged from Tedder's apartment. Later that same day, he conducted a lineup twice for Mrs. Fruehling to insure that no mistake was made in the identification of defendants.

Park Ridge Police Officer, Louis Sciarra, testified for the defense. He had a conversation with Mrs. Fruehling on August 12, 1976, in which she described her assailants. Defendants' trial counsel was not allowed to elicit testimony from Sciarra about the composite sketches he prepared at her direction, nor was he allowed to question Sciarra about the alleged similarities in the two sketches. Mrs. Fruehling separately described both men to Sciarra. Although she described both men as having similar facial characteristics, she told him that the eyes, nose and lips of the two men were different.

OPINION

The first issue that defendants raise concerns whether they were denied the effective assistance of counsel guaranteed under the United States Constitution. (U.S. Const., amends. VI, XIV.) This claim is premised upon both trial counsel's failure to preserve for review certain issues raised at trial, and counsel's alleged reliance on the disclaimer of waiver provision contained in his motion for new trial.

■■ In Illinois, the standard for inadequate representation by counsel is whether the representation is of such a character as to reduce the trial to a farce or sham. (*People v. Virgil* (1977), 54 Ill. App. 3d 682, 370 N.E.2d 74.) For a defendant to prevail in this regard, the following factors must clearly be established: (1) actual incompetence of counsel, as reflected by the manner of carrying out his duties at trial; and (2) substantial prejudice

resulting, without which the outcome probably would have been different. *People v. Johnson* (1977), 45 Ill. App. 3d 255, 359 N.E.2d 791.

In the instant appeal, no actual incompetence was shown by counsel's failure to include certain issues raised at trial in the motion for new trial. Certainly, the choice of which issues, if any, to preserve for appeal is a matter of judgment on an attorney's part. Normally, an attorney's exercise of discretion or judgment at trial does not constitute incompetence. (*People v. Virgil* (1977), 54 Ill. App. 3d 682, 370 N.E.2d 74.) In fact, it has been held that an attorney's failure to file any post-trial motion is only a factor in determining counsel's competence. (*People v. Greenlee* (1976), 44 Ill. App. 3d 536, 358 N.E.2d 649.) Moreover, our review of the issues that counsel failed to include in the motion for new trial shows no substantial prejudice to defendants, since those issues would not have affected defendants' convictions, and an effort to raise them would have been futile. (*People v. Knowles* (1979), 76 Ill. App. 3d 1004, 395 N.E.2d 706.) We now turn to those issues.

The first issue that counsel failed to include in the motion for new trial was the alleged lack of probable cause for defendants' warrantless arrest, and the attendant suppression of the fruits of the arrest. This issue was argued vigorously by counsel at pretrial hearing and denied by the trial court.

An arrest without a warrant is proper if an officer has probable cause to believe that the person is committing or has committed an offense. (*People v. Faulisi* (1977), 51 Ill. App. 3d 529, 366 N.E.2d 1072.) The existence of probable cause or reasonable grounds for arrest depends on the totality of facts and circumstances known to the officer at the time of the arrest. (*People v. Williams* (1978), 62 Ill. App. 3d 874, 379 N.E.2d 1222.) Probable cause to arrest may be founded upon evidence not admissible at trial of the charge in question. *People v. Smith* (1977), 50 Ill. App. 3d 320, 365 N.E.2d 558, *cert. denied* (1978), 435 U.S. 1008, 56 L. Ed. 2d 390, 98 S. Ct. 1880.

In the instant case the totality of the facts and circumstances known to Officer Koehler at the time of the arrest reveals that he had probable cause to arrest Tedder and Nettles. During the first week of September 1976, he received sketches and physical descriptions of two men wanted for a home invasion occurring in Park Ridge, Illinois, on August 12, 1976. Because he was then investigating another matter, Koehler paid little attention to this information. The next time he looked at the sketch was on or about September 21, 1976. Upon closer review, Koehler recognized one sketch as portraying Tedder. He then obtained the offense report from the Park Ridge police and noticed that the offenders wore surgical gloves during the crime. Koehler remembered that that was the modus

operandi of Tedder, with whom he had dealt since 1971. Tedder was described in the report as 30 years old, muscular, agile, having a Southern accent and thick bushy eyebrows. Nettles was said to be tall, skinny and emaciated, and about 35 years old, Koehler realized that these descriptions matched those of Tedder and Nettles, whom he knew had been sharing an apartment at 844 W. Ainslie, Chicago, for the previous month. Armed with this information, Koehler and other Chicago police officers arrested defendants in front of Tedder's apartment on September 21, 1976. The sketch of Tedder was "one of the best Identi-Kit match-ups that I [Koehler] had ever seen." The other sketch bore a similarity to Nettles and identified him when coupled with the physical description in the police report. Tedder, 34, was 5'5" tall and 160 pounds at the time of trial, while Nettles, 39, was 6'3" tall and weighed 150 pounds.

■ Although Koehler had no warrant for defendants' arrest, he was aware that these men matched the physical descriptions and composite sketches reported by the victim. These factors, coupled with Koehler's prior dealings with Tedder, supplied the probable cause for defendants' arrest. (See *People v. Philson* (1979), 71 Ill. App. 3d 513, 389 N.E.2d 1223; *People v. Jennings* (1967), 84 Ill. App. 2d 33, 228 N.E.2d 566; *United States ex rel. Burbank v. Warden* (7th Cir. 1976), 535 F.2d 361.) Defendants reliance on *People v. One 1968 Cadillac* (1972), 4 Ill. App. 3d 780, 281 N.E.2d 776, is misplaced. In that case defendant was neither observed violating any law nor did he match a physical description of a wanted suspect, but was merely "known" as a gambler, and had been previously arrested. In the present case Koehler not only recognized the modus operandi of Tedder in the Park Ridge home invasion and knew him to reside with Nettles at Tedder's apartment, but also had physical description and sketches of both intruders that fit both defendants.

Since there was probable cause for their arrest, defendants' pretrial motion to quash the arrest and suppress the evidence was properly denied. Consequently, the lineup and in-court identification of defendants, along with all property seized from them, was admissible into evidence.

Defendants' second contention, raised at trial, but not included in the motion for new trial, is that they were improperly denied their motion for discharge for violation of their constitutional right to a speedy trial. (U.S. Const., amend. VI.) Defendants specifically argue that they were not promptly retried after the first trial, which resulted in a mistrial.

The constitutional right to a speedy trial cannot be defined in terms of an absolute or precise standard of time within which an accused must be given trial. (*People v. Henry* (1970), 47 Ill. 2d 312, 265 N.E.2d 876.) Four factors are to be considered in determining whether there has been a breach of defendants' constitutional right to a speedy trial: the length of

delay; the reasons for the delay; the prejudice to the defendant; and whether the defendant may be considered as having waived the right. (*People v. Bazzell* (1977), 68 Ill. 2d 177, 369 N.E.2d 48.) When a mistrial has been declared, the standard for evaluating the passage of time before the retrial is whether the interval is reasonable. *Bazzell.*

■ In the instant case the delay between the date defendants were taken into custody, September 21, 1976, and the beginning of jury selection for the first trial, May 20, 1977, was not unreasonable, in that defendants were accountable for much of the delay. As to the period from mistrial, May 24, 1977, to the date of retrial, August 16, 1977, only 84 days elapsed. The first 35 days were unexplained by the State, but the parties agreed that the next 49 days were requested by the State because of the absence of a material witness, Police Officer Koehler. Nevertheless, the record reveals no prejudice to defendants as a result of the delay during this period, and defendants have pointed to none. Consequently, we find that the delay between mistrial and retrial was reasonable. (See *Bazzell*, 68 Ill. 2d 177, 369 N.E.2d 48; *People v. Daniel* (1979), 76 Ill. App. 3d 646, 395 N.E.2d 163.) Therefore, defendants were not denied their constitutional right to a speedy trial.

The final issue that defense counsel failed to include in the motion for a new trial was the trial court's denial of defendants' request to impeach Mrs. Fruehling's identification testimony with the composite sketches prepared at her direction. Defendants claim that the sketches were admissible as prior inconsistent statements of Mrs. Fruehling, and that it was error to preclude their use of this impeachment.

The composite sketches in question were prepared by Officer Sciarra by use of an "Identi-Kit." Although the record does not reveal the actual process by which these sketches were assembled our understanding of an "Identi-Kit," gleaned from oral arguments, is as follows. An "Identi-Kit" consists of several series of individually numbered transparent plastic overlays. Each series represents a different facial feature of the alleged suspect. A witness selects one of the overlays from each of the series and places them together until an image resembling the suspect appears. This image is referred to as a "composite sketch" and can be photographed and sent to the other police officers at various locations. A composite sketch constructed from an "Identi-Kit," as in this case, differs from the traditional artist's sketch, which is a drawing made from an artist's freehand interpretation of physical descriptions he receives from a witness.

■ The courts in Illinois have consistently held that it is error to admit a police artist's sketch into evidence because the sketch constitutes impermissible written hearsay evidence. (*E.g., People v. Fair* (1977), 45 Ill. App. 3d 301, 359 N.E.2d 848; *People v. Rogers* (1979), 75 Ill. App. 3d

866, 394 N.E.2d 813.) An artist's sketch frequently reflects the artist's interpretive impressions based upon the personal observations of another and is therefore inadmissible. (*People v. Turner* (1968), 91 Ill. App. 2d 436, 235 N.E.2d 317.) There may be situations, however, where a witness can adopt the artist's sketch by reviewing the various features portrayed on the sketch and accepting the final product as substantially accurate. (See *People v. Burgin* (1979), 74 Ill. App. 3d 58, 392 N.E.2d 251.) When this occurs, the sketch is no longer the statement of the artist, but becomes, by adoption, that of the witness. In this situation, the witness may be subject to cross-examination by use of the sketch for any material discrepancies between the sketch and subsequent identifications testimony.

Turning to the record in this case, we find that Mrs. Fruehling never affirmatively adopted the two finished composite sketches as her own. She told Officer Sciarra that the assailants had different eyes, lips. and noses, yet Sciarra testified that the plastic overlays representing those features on the sketches of Tedder and Nettles were identical. At no time did Mrs. Fruehling express satisfaction with his efforts to match the descriptions she gave him with the finished composite sketches.

■ Because Mrs. Fruehling never made a clear and definite adoption of the sketches, we conclude that the trial court properly found them inadmissible for impeachment purposes.

The foregoing issues, even if raised by counsel in the motion for new trial, would not have affected defendants' convictions. We therefore hold that counsel's representation of defendants was effective, and defendants were not substantially prejudiced in this regard.

■ We now turn to other issues raised by defendants. Defendants contend that they were not proven guilty beyond a reasonable doubt. A verdict of guilty will not be set aside unless the trial evidence is so improbable as to raise a reasonable doubt as to defendants' guilt. (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666.) Identification by a single witness who had opportunity to observe defendants is sufficient to support a guilty verdict. (*People v. Butler* (1976), 41 Ill. App. 3d 750, 354 N.E.2d 568.) Minor discrepancies in descriptions by the identification witnesses are to be considered by the jury in determining the credibility of witnesses. *People v. Harrison* (1978), 57 Ill. App. 3d 9, 372 N.E.2d 915.

■ Mrs. Fruehling testified that the upstairs hall light and defendants' flashlights provided sufficient illumination for her to identify Tedder and Nettles. When she was alone with Nettles for a period of 20 minutes, he was only a short distance away from her. She observed Tedder as he held her and pistol-whipped her, and later as he prepared to leave her basement. Because of these opportunities for observation, she immediately identified both defendants at the lineup and later in court.

We find the evidence at trial not so improbable as to raise a reasonable doubt as to defendants' guilt.

Defendants' next issue, preserved in Tedder's *pro se* motion for a new trial, deals with the closing arguments by the prosecutor which allegedly deprived defendants of a fair trial. Defendants specifically object to the following three comments made to the jury by the prosecutor:

"You heard an Assistant State's Attorney talk. Why? Because the procedure in Cook County [*sic*] we don't like to arrest innocent men. We don't like to charge innocent men. And we don't like to prosecute innocent men.

　　＊　＊　＊

The most important question that you can ask yourself is can you ever forget these faces. And I put it to you you cannot because I know I can't.

　　＊　＊　＊

And let me submit this to you: I want you to think when you go back to that jury room of what's going on in your home now and when you think about that, and the people that you've left alone or your relatives who are alone, you will come back with a finding of guilty."

A prosecutor is allowed wide latitude in making closing arguments. (*People v. Dykes* (1978), 66 Ill. App. 3d 403, 383 N.E.2d 1210.) Generally, the trial court's determination of the propriety of the closing arguments will not be disturbed absent a clear abuse of discretion. *People v. Smothers* (1973), 55 Ill. 2d 172, 302 N.E.2d 324.

■ In the instant case, we initially note that no objections were made by defense counsel during the prosecutor's closing arguments and any prejudice to defendants arising from these arguments may be considered waived. (*People v. Simmons* (1974), 21 Ill. App. 3d 310, 315 N.E.2d 226.) Nevertheless, after reviewing defendants' arguments it is our opinion that certain comments made by the prosecutor, though improper, neither constituted a material factor in defendants' convictions nor will they require reversal. *People v. Lewis* (1976), 38 Ill. App. 3d 995, 349 N.E.2d 528.

■ Defendants challenge the prosecutor's first two statements as improper because they: (1) vouch for the strength of the State's case by placing the credibility of the State's Attorney's Office behind the charge, and (2) inject the prosecutor's personal feelings and various immaterial considerations into the case. A similar attack was made in *People v. Skorusa* (1973), 55 Ill. 2d 577, 304 N.E.2d 630, where the prosecutor stated:

"I say to you now, ladies and gentlemen, that if we in conscience

didn't know for a fact that the defendant, Stanley Skorusa, shot and killed Irene Kowalkowski, you ladies and gentlemen wouldn't be sitting here in judgment of him." (*Skorusa*, 55 Ill. 2d 577, 585, 304 N.E.2d 630, 634.)

The court held that comment to be harmless error in light of the overwhelming evidence of guilt presented at the trial. The cases of *People v. Fuerback* (1966), 66 Ill. App. 2d 452, 214 N.E.2d 330, *People v. Cepek* (1934), 357 Ill. 560, 192 N.E. 573, and *People v. King* (1916), 276 Ill. 138, 114 N.E. 601, cited by defendants are distinguishable from the present situation. In each of those cases, the inflammatory remarks by the prosecutor, only when coupled with other errors at trial, were a material factor in defendants' convictions. There were no such errors in the trial below. Defendants' convictions resulted from the clear convincing testimony of the victim, not from the prosecutor's remarks.

Defendants also assert that the prosecutor's third comment was a blatant appeal to the jurors' fears that was made solely in order to convict them. We disagree.

■■ It is proper argument to urge the effective administration of law through vigorous law enforcement. (*People v. Griggs* (1977), 51 Ill. App. 3d 224, 366 N.E.2d 581.) We note that a similar warning to the jury that they should not release the defendant unless they wanted an unsafe community has been found to be not inflammatory in nature. (*People v. Taylor* (1974), 18 Ill. App. 3d 367, 373, 309 N.E.2d 642, 647.) Although we do not encourage the type of arguments made by the prosecutor at trial, we do not feel that they deprived defendants of a fair trial. Therefore, we hold that any error resulting from the comments was harmless.

Defendants have raised several other contentions in Tedder's *pro se* supplementary brief filed with this court. We have reviewed these contentions and have found them to be without merit.

The final issue for review is defendants' assertion that the sentences they received for armed robbery, 30 to 50 years in the penitentiary, are excessive. Defendants argue that the length of the sentences are unduly harsh in that they were independently sentenced for other crimes arising out of the same incident.

Sentencing is not a function of a reviewing court. This court will not substitute its judgment for that of a trial court merely because it might have imposed a different sentence. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) The trial judge sees the defendants and is in a better position to appraise them and evaluate the likelihood of their rehabilitation. (*People v. Willett* (1976), 44 Ill. App. 3d 545, 358 N.E.2d 657.) Defendants' sentences will not be disturbed absent an abuse of discretion by the trial court. *Perruquet.*

■■ The instant defendants both have lengthy criminal backgrounds

which include convictions for burglary and armed robbery. The present crimes for which they stand convicted involve the home invasion and severe beating of an elderly woman whom they threatened to "silence" if she went to the police. Considering the nature and circumstances of the offense and particularly the history and character of defendants, we cannot say that the sentences imposed in the case at bar are an abuse of discretion.

For the reasons stated, we affirm the judgment of the circuit court of Cook County.

Affirmed.

SULLIVAN, P. J., and WILSON, J., concur.