653 A.2d 972

**Nuri Tuncer ICGOREN**

v.

**STATE of Maryland.**

**No. 827, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

Feb. 10, 1995.

408

**410**

Frederic C. Heyman and Katherine K. Thompson (Heyman & Schlaich, P.A. on the brief), Bel Air, for appellant.

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and William R. Hymes, State's Atty. for Howard County, Ellicott City, on the brief), for appellee.

Submitted before BISHOP, ALPERT and CATHELL, JJ.

CATHELL, Judge.

Appellant, Nuri Tuncer Icgoren, appeals from the sentence imposed on a jury verdict in the Circuit Court for Howard County (Kane, Jr., J., presiding) rendered in his third trial[1] on various charges arising out of the murder of Raymond Jerman, Sr. The murder occurred in September of 1987. The jury found appellant guilty of first degree murder, robbery with a dangerous and deadly weapon, robbery, common law assault, and common law battery. He was subsequently sentenced to a term of imprisonment for life. He presents the following five questions to us:

I. Did the Trial Court err in failing to dismiss the Appellant's case for lack of a speedy trial?

II. Did the Trial Court err in refusing to allow Defense Counsel to present evidence regarding prior inconsistent statements made by Henry A. Massey regarding the amount of cash normally carried by the victim?

---

[1] The first trial resulted in a conviction, which was subsequently reversed by this Court. The second trial ended in a hung jury.

III. Did the Trial Court err in failing to suppress the Appellant's statements?

IV. Did the Trial Court err in permitting improper closing argument by the prosecutor?

V. Did the Trial Court err in denying the Appellant's renewed Motion In Limine to exclude any and all reference and/or testimony relating to the victim's vehicle, etc., or in the alternative, Motion to Dismiss the Indictment for destruction and or loss of evidence?

## The Facts

The victim, Raymond Jerman, Sr., was, at the time of his death, self-employed as a candy and produce vender, primarily engaged in that activity at Maryland's race tracks and other venues where Maryland's racing community operated. As an adjunct, he also, apparently for a fee, cashed checks for members of that community. In this capacity, he customarily carried large sums of cash, *i.e.*, there was evidence that he carried between $15,000 to $30,000 or more on his person and in his truck.

On September 29, 1987, Mr. Jerman was found in his parked truck in Howard County, Maryland, dead from multiple stab wounds. Found on his person at that time were ten checks and $326.02 in cash.

There was evidence that, on the day of the homicide, appellant was seen by one witness leaving Laurel Race Course about five minutes after the victim had left by the same exit that the victim had used. Another witness testified that she later observed appellant leaning into the window of the victim's truck, at the same location in which the truck was later found with the victim's body. Two other witnesses testified that they saw appellant traveling on the same road as the victim at about the same time as the victim.

Another witness testified that appellant had asked to borrow a "couple hundred dollars" on the day before the victim was killed and was loaned $10. That witness also noted that,

on the day of the murder, appellant had repaid the $10 and, at that time, "had a large sum of money, approximately 'a couple inches thick.'" Appellant's former girlfriend testified that she had seen the victim cash a check for appellant and that appellant had jokingly commented "that he would like to rob Mr. Jerman." Yet another witness testified that appellant had tried to get the witness to assist appellant in robbing the victim. This witness apparently was the person who furnished the information leading to appellant's arrest.

After his arrest, appellant told police officers that he had, in fact, stopped along the shoulder where Mr. Jerman's truck and body were found to see if he needed assistance but, when he saw the victim's injuries, panicked and left.

There was, to be sure, some conflicting evidence that one or more other witnesses had seen a person not matching appellant's description at Mr. Jerman's truck during the relevant period. There was additional evidence presented that appellant lacked a motive to commit the offense and had just received a substantial sum of money from another source. There was also evidence presented of appellant's good character.

As will appear evident from our later recitation of the arguments made below, appellant, in this third trial, asserted a speedy trial attack that was multi-barrelled. He asserted that he had been denied his Sixth Amendment right to a speedy trial (1) because of the time that had elapsed from the time of his arrest prior to the first trial to the date of the third trial; and (2) in any event, because of the delay that occurred between the hung jury/mistrial in the second trial and the date of the third trial.

In addition to asserting a Sixth Amendment right to a speedy trial, he asserts that his right under Maryland Rule 4–271 to be tried within 180 days has been violated and the charges against him should be dismissed for that reason as well.

Accordingly, before we conduct the traditional *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), four

pronged analysis, we shall address and dispose of these two initial issues: (1) Is the entire period between the first arrest to final trial considered or just the period between the second mistrial and third trial; and (2) do we also consider the 180–day *"Hicks"* rule? We address these preliminary issues in reverse order.

### Article 27 § 591, Maryland Rule 4–271 "Trial Date," and the *"Hicks"* Rule, *State v. Hicks,* 285 Md. 310, 403 A.2d 356 (1979)

Maryland Code (1957, 1992 Repl.Vol.), Art. 27 § 591 provides:

(a) The date for trial of a criminal matter in a circuit court:

(1) Shall be set within 30 days after the earlier of:

(i) The appearance of counsel; or

(ii) The first appearance of the defendant before the circuit court, as provided in the Maryland Rules; and

(2) May not be later than 180 days after the earlier of those events.

(b) On motion of a party or on the court's initiative and for good cause shown, a county administrative judge or a designee of that judge may grant a change of the circuit court trial date.

(c) The Court of Appeals may adopt additional rules of practice and procedure for the implementation of this section in circuit courts.

Maryland Rule 4–271(a) provides, in part:

(1) The date for trial in the circuit court shall be set within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the circuit court pursuant to Rule 4–213, and shall be not later than 180 days after the earlier of those events.... On motion of a party, or on the court's initiative, and for good cause

shown, the county administrative judge or that judge's designee may grant a change of a circuit court trial date.

■ In *Donalds v. State*, 49 Md.App. 106, 430 A.2d 113, *aff'd*, 291 Md. 276, 434 A.2d 581 (1981), Donalds was first convicted on February 7, 1978. After several proceedings before the trial court, this Court, and the Court of Appeals, that conviction was reversed. He was retried on August 5, 1980, approximately 194 days from the date of our mandate vacating his prior conviction. On appeal, Donalds asserted that he had not been brought to trial within 180 days as required by Art. 27 § 591 and Maryland Rule 746 (the predecessor to current Maryland Rule 4–271, sometimes referred to as the *"Hicks"* Rule).

We declined to vacate his conviction on retrial, asserting that the statute and rule were not intended to cover the occurrence of a retrial. We commented that "it is the first bringing of an accused to trial that is contemplated by both of them." 49 Md.App. at 109, 430 A.2d 113. The Court of Appeals, at 291 Md. 276, 434 A.2d 581 (1981), stated:

> Certiorari was granted ... to consider whether the Court of Special Appeals erred in upholding the denial of petitioner's motion to dismiss under Mary[land] Rule 746. For the reasons stated in [our *Donalds'* opinion], the judgment of the Court of Special Appeals is affirmed.

We noted again in the retrial (after a mistrial) case of *Collins v. State*, 52 Md.App. 186, 194, 447 A.2d 1272 (1982), *aff'd*, 296 Md. 670, 464 A.2d 1028 (1983), that "appellant moved to dismiss ... because he had not been tried within 180 days as required by Maryland Rule 746.... The trial court correctly denied appellant's motion since we have held that the 180 day rule (*Hicks* rule) does not apply to retrials." We reiterated the holding again in *Eccles v. State*, 59 Md.App. 554, 563, 476 A.2d 1183 (1984), stating, "[W]e shall adhere to the established law that Md.Rule 746 applies to the original trial and not to retrials." *See also State v. Mines*, 48 Md.App. 30,

38–39, 425 A.2d 1044 (1981) ("[I]t is the first bringing of an accused to trial that is contemplated.... [T]he provisions of the rule were no longer relevant ..., and ... they were not revived upon the striking of the guilty plea since the rule is silent with regard to a further trial.")

We therefore conclude that neither Md.Code Art. 27 § 591 nor Md.Rule 4–271 (the "*Hicks* Rule") is applicable in the case "*sub judice.*" [2]

## THE APPROPRIATE PERIOD OF DELAY

So far as we have been able to discern, Maryland's appellate courts have never resolved a Sixth Amendment speedy trial issue in the context of the cumulative period between original arrest, conviction, reversal, retrial, a hung jury, mistrial, and the third retrial.[3]

The following exchange occurred between the court and appellant's counsel at trial concerning the argument that the entire period between the original arrest and the last trial should be considered:

The court confirmed counsel's initial position.

[Y]our position is that the cumulative delays from the time he was originally arrested until this trial in October is the focus that you've asked me to make.

**2.** We note, however, that some other jurisdictions addressing their speedy trial statutes have held that their statutory time periods run anew in proceedings subsequent to first trials. The Court of Appeals recognized this in *State v. Brown*, 307 Md. 651, 657, 516 A.2d 965 (1986) ("Unlike statutes or rules in many other jurisdictions, [our rules or statutes] were not intended to be codifications of the constitutional speedy trial right....") *Accord Marks v. State*, 84 Md.App. 269, 281, 578 A.2d 828 (1990), *cert. denied*, 321 Md. 502, 583 A.2d 275 (1991).

**3.** A similar procedural situation existed in *Coleman v. State*, 49 Md.App. 210, 431 A.2d 696 (1981), but there, the complaint on appeal was directed "solely at the delay in appellant's retrial following our remand for that purpose...." 49 Md.App. at 217, 431 A.2d 696. It did not concern cumulative periods or mistrial/retrial periods.

[DEFENSE COUNSEL]: That's correct.

The Court then gave its opinion as to the appropriate period:

[I]t would seem to me my focus should be on, on the delay from the time the second trial was concluded until the third trial was commenced.

Counsel responded:

So I think any evaluation ... has to commence with the date ... his constitutional right attached.... [T]hat right attaches from the beginning, from October 10th, 1987 [the date of the original arrest].... [I]f we say nothing matters prior to November 12th, 1992 [the date of the mistrial in the second trial], ... and we should only consider from that date up until October 25th, 1993, then we're ignoring approximately five years in this case.

The trial court then responded, "[I]sn't his ... constitution[al] right to a speedy trial perfected by a trial? ... [W]hat [more] can the State do ... than to ... give them a trial." In turn, appellant's counsel responded: "I don't think we can just ignore it [the periods involved in the first two trials] and say that any delay was cured by a trial in the past...." The court then noted that there had been previous motions based upon a lack of speedy trial and that the case had not been dismissed on that basis in the previous trials.

In conclusion, the trial court again noted appellant's position that the cumulative delay should be considered. The court then opined:

I'll assume for the sake of my discussion, that the Court should ... be concerned about the delay occasioned from his arrest in '87 to the trial ... in October the 25th [1993].... [T]here have been two trials, ... the constitutional right to a speedy trial .. is insured by a trial.... [T]he Defendant's constitutional right to a speedy trial is perfected ... by a trial.... [T]he reason for those periods of delays [until the mistrial in trial two] ... primarily have been the trials, two trials, the various motions associated with the two trials, a rather prolonged sentencing procedure ... and an Appellate Court procedure.... [T]he primary

reason was the time associated with those two trials.... [T]hat to me is of critical significance.... I don't believe that the Defendant was ... denied his constitutional right to a speedy trial [referring to the first two trials].

In *Davis v. State,* 4 Md.App. 492, 243 A.2d 616 (1968), *cert. denied,* 252 Md. 730 (1969), Davis alleged he had been denied a speedy trial because the trial court had not ruled on his Motion for a New Trial for a year. We held, "The right to a speedy trial does not apply to post trial proceedings." 4 Md.App. at 498, 243 A.2d 616 (citing *Ash v. State,* 238 Md. 317, 208 A.2d 691 (1965); *Brown v. State,* 2 Md.App. 388, 234 A.2d 788 (1967)). We noted the defendant's contentions in *Howard v. State,* 3 Md.App. 173, 174, 238 A.2d 135 *cert. denied,* 250 Md. 731 (1968), that "the failure of court-appointed counsel to file a brief constitutes a failure on the part of the State to diligently process the appeal ... amount[ing] to a denial of a speedy trial or a denial of due process." We held: "[W]e see no denial of due process and we know of no authority to support the contention that the delayed appeal may constitute a denial of a speedy trial in the Constitutional sense." *Id.*

The Court of Appeals noted, in *Wilson v. State,* 281 Md. 640, 664, 382 A.2d 1053, *cert. denied,* 439 U.S. 839, 99 S.Ct. 126, 58 L.Ed.2d 136 (1978), that "within the sense of the Sixth Amendment the right to a speedy trial does not include the right to a speedy appellate review." *See also State v. Lawless,* 13 Md.App. 220, 230, 283 A.2d 160 (1971), *cert. denied,* 264 Md. 749, *cert. denied,* 409 U.S. 855, 93 S.Ct. 192, 34 L.Ed.2d 99 (1972) (holding no speedy trial right in respect to motions for new trials, appeal periods, defective delinquency petitions). In *Ash,* the defendant asserted that he had been denied his state constitutional right to a speedy trial under Article 21 of the Maryland Declaration of Rights because over seven months had elapsed between the filing of a Motion for New Trial and a hearing on the motion. The Court held:

[T]his right has no application to a hearing on a motion for a new trial. We think the language used by the drafters of Art. 21 clearly imports guarantees applicable to the processes leading to and ending with the criminal trial itself, and

we do not believe that either the motion for a new trial or the hearing thereon constitutes a "trial" or any constituent part thereof within the meaning of Art. 21.

238 Md. at 320. In *Brady v. State,* 36 Md.App. 283, 292, 374 A.2d 613 (1977), we noted: "Appellant argues that in considering the length of the delay we should consider all of the time that has passed since the original indictment. We disagree." We declined to consider the time between the *nolle prosequi* of the original charge and the reindictment in our speedy trial analysis.

Some federal and foreign jurisdictions have also declined to consider cumulative time involved with multiple proceedings.[4] *See Arnold v. McCarthy,* 566 F.2d 1377, 1382 (9th Cir.1978) ("Arnold asks us to lump together the delay incurred by him during his two trials.... This we cannot do."); *United States v. Robles,* 563 F.2d 1308, 1309 (9th Cir.1977), *cert. denied,* 435 U.S. 925, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978) (The "defendant was afforded a speedy trial; his conviction was vacated ... and he was retried.... These facts do not amount to a denial of his Sixth Amendment rights."); *Kops v. State,* 220 Ind. 373, 42 N.E.2d 58, 62–63 (1942) (no dismissal when delay caused by mistrial); *Johnson v. State,* 641 S.W.2d 367, 368 (Tex.App. 1982) (delay in appellate process not considered); *State v. Dehler,* 257 Minn. 549, 102 N.W.2d 696 (1960) (delay of over fifteen years between first and second proceeding); *State v. Hadley,* 249 S.W.2d 857, 862 (Mo.1952) (delay due to reversal resulting from "belated" discovery of error not grounds for dismissal); *Application of Hayes,* 301 P.2d 701, 704 (Okla. Crim.App.1956) ("The procedure since the ... mandate ... is all that may ... be considered...."); *People v. Tedder,* 83 Ill.App.3d 874, 39 Ill.Dec. 53, 59, 404 N.E.2d 437, 448 (1980) ("[T]he standard ... is whether the interval [between mistrial and retrial] is reasonable."); *People v. Hudson,* 46 Ill.2d 177,

---

4. Several of the foreign cases concerning cumulative time periods involve speedy trial statutes. We include them here as the reasoning is similar to that expressed by our courts in respect to Sixth Amendment rights in the cases we have mentioned.

263 N.E.2d 473 (1970); *Ferguson v. People,* 160 Colo. 389, 417 P.2d 768 (1966).

Thus, it is clear to us that the Maryland cases having similar factual situations, as well as the weight of authority elsewhere, support a holding, and we so hold, that, in construing a party's right to a speedy trial under the Sixth Amendment of the Federal Constitution and Article 21 of the Declaration of Rights of Maryland's Constitution, in a serial trial context, we are *generally,* absent extraordinary circumstances not present here, only concerned with the period between the receipt of an appellate mandate, if the next prior conviction is reversed, and the subsequent retrial, or the period between the declaration of a mistrial and the commencement of the retrial. In the case *sub judice,* we will, thus, only consider the period from the date of the mistrial of appellant's second trial and the commencement of his third trial.

### Did the Trial Court Err in Failing to Dismiss Appellant's Case for Lack of a Speedy Trial?

We opined in *Howell v. State,* 87 Md.App. 57, 79–80, 589 A.2d 90, *cert. denied,* 324 Md. 324, 597 A.2d 421 (1991):

> "In all criminal prosecutions, the accused shall enjoy the right to a speedy ... trial...." U.S. Const. amend. VI. This right is imposed by the Due Process Clause of the Fourteenth Amendment on the states. *Barker v. Wingo,* 407 U.S. 514 [514–15], 92 S.Ct. 2182, 2184, 33 L.Ed.2d 101 (1972).
>
> The Sixth Amendment right to a speedy trial is ... not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitations. The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused

by arrest and the presence of unresolved criminal charges.

*United States v. MacDonald,* 456 U.S. 1 [8], 102 S.Ct. 1497, 1502, 71 L.Ed.2d 696 (1982).

The Supreme Court, in *Barker,* applied this right to a case involving a defendant who was not brought to trial until more than five years after his arrest. Justice Powell, writing for the Court, adopted a balancing test which took into account the conduct of both the prosecution and defense in determining the constitutional effect of a delay. *Id.* [407 U.S. at 528–31] 92 S.Ct. at 2191–92. He observed:

A balancing test necessarily compels courts to approach speedy trial cases on an *ad hoc* basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.

The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.

*Id.* at [530, 92 S.Ct. at] 2192 (footnote omitted). *See also United States v. Neumann,* 474 U.S. 242, 106 S.Ct. 610, 88 L.Ed.2d 587 (1986); *United States v. Loud Hawk,* 474 U.S. 302, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986); *United States v. $8,850,* 461 U.S. 555 [564–65], 103 S.Ct. 2005, 2012, 76 L.Ed.2d 143 (1983); *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983); *United States v. Valenzuela–Bernal,* 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). In *Brady v. State,* 291 Md. 261, 266, 434 A.2d 574 (1981), the Court of Appeals pointed out that

A problem peculiar to the *Barker* test is its use of the terms *presumption of prejudice* and *actual prejudice.* When there has been a lengthy pretrial delay, one of

constitutional dimension, then a presumption arises that the defendant has been deprived of his right to a speedy trial; a presumption of prejudice. Once this presumption asserts itself, a balancing test must be employed which involves a weighing of four factors, one of which is actual prejudice. Actual prejudice involves a consideration of three interests the speedy trial right is meant to protect. Whatever importance it assumes in the final outcome is a function of the facts of the particular case. [Italics in original.]

## I.

### Length of Delay

The sequence of events applicable to the present trial is as follows:

November 12, 1992—Mistrial declared.

November 25, 1992—Demand for Speedy Trial.

February 2, 1993—Entry of appearance of defendant's counsel.

February 2, 1993—Another demand for speedy trial filed.

February 2, 1993—Motion to suppress evidence filed.

February 2, 1993—Motion for discovery filed by defendant.

February 11, 1993—Answer to motion for discovery filed by State.

March 19, 1993—Motion for modification of pretrial release filed.

March 26, 1993—Trial set for October 25. Probably set on this date.

April 1, 1993—Motion for pretrial release granted.

April 8, 1993—Defendant apparently released on bond.

By April 15, 1993—Trial had been set for October 25, 1993.

May 25 through June 3, 1993—Various motions by the State to summons and/or compel attendance of various witnesses from Texas, Florida, Nebraska, West Virginia,

Delaware, Washington, D.C., Kentucky and various witnesses from within Maryland.

May 28, 1993—Various orders to compel attendance of witnesses.

May 26, 1993—Judge's letter to counsel noting that as a result of this "recent conference ... trial will commence on October 25, 1993."

August 12, 1993—Motion to dismiss on speedy trial grounds filed by appellant. Motion renewing all previous motions filed.

August 19, 1993—Motion for dismissal on speedy trial grounds denied.

October 25, 1993—Trial.

■ The delay in this case is calculated from the date of the previous mistrial, *i.e.*, from November 12, 1992. The period is, thus, eleven months, thirteen days. Accordingly, though barely so, it was presumptively of constitutional dimension.

### Reason for Delay

We here note what we said in *Howell, supra,* 87 Md.App. at 81–82, 589 A.2d 90:

Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

In the present case, *in this third trial context,* the trial was held on the first date set for trial. There were no continuances of the trial date. Our concern, as we have said, is the delay between mistrial and retrial. To that end, we attempt

to discern the reasons, if any, for the setting of the initial trial date for October 25, 1993.

> In support of his motion below, counsel argued, in part:

> We went from the mistrial date of November 12th, 1992 through April of '93 before any trial date was set by the Court, despite two intervening speedy trial demands.

Counsel then extensively iterated what he perceived were the delays in the previous two trials, finally noting:

> Now ... also from November 12th, 1992 until the coming trial date of October 25th, 1993, we have approximately a hundred and fifty days before any action was taken to set a trial date and then another hundred and ninety-eight days or so ... until the trial.

Appellant's counsel continued to assert, vigorously, that the court should consider all of the cumulative time between appellant's arrest before the first trial and the beginning of the third trial after the second trial mistrial. The State responded:

> I don't see how the Court should consider this a cumulative test here. It has been approximately one year since this matter was retried ... that turned out to be a mistrial. In the interim, ... since last year, the Defendant has retained new Counsel.... There was a period of time where the State waited for the appearance of new Counsel.... Eventually, the State ... initiated a conference [where] you and I and Mr. Trainor met ..., at our very earliest convenience.... *[W]e set an agreed upon trial date ... October ... 25th ... 1993. It was the State ... who initiated that chambers conference ... that date was agreed upon by counsel in accordance with the Court's schedule, ... in accordance with Defense Counsel's schedule and in accordance with my schedule.* [Emphasis added.]

Appellant did not contradict that which we have emphasized.

The trial court then addressed certain delays it perceived in our handling of the first appeal, saying:

It might be a great opportunity for a Trial Judge to impose sanctions on an Appellate Court for its conduct in the course of a trial. . . . [I]t's an interesting concept, isn't it? . . . [M]aybe this would be an opportunity by this Court to say that the Appellate Court in some way contributed to the denial of the Defendant's rights. That's just an aside and maybe somebody will listen to this record sometime and might be interested by the Court's comments.

We are.[5] The trial court continued:

In looking at the time period between trial two and October 25th . . . I recall meeting . . . with Counsel. . . . I was concerned about setting this case. . . . Counsel for the State had trial calendars. The Court had a . . . trial calendar which involved the unavailability of one of our Judges for an extensive period of time because of a rather protracted murder trial. . . . *[I ]t was brought to my attention by Counsel for the State and the Defense, . . . that it would be somewhat burdensome to get various witnesses here. The best time of the year because of their employment would probably be in the fall. And, I'm satisfied that the earliest possible trial date that we could arrange consistent with this Court's calendar and the calendar[s] of Counsel, was the October 25th date. . . .* [T]he primary reason for the delay was the inability of this Court to promptly try the case *but the desire of this Court to schedule a case consistent with Counsel[s'] schedule[s] and consistent with the availability of witnesses. . . .* [I]n weighing all of those factors, I don't believe that the Defendant was denied his constitutional right to a speedy trial . . . between trial two and trial three. [Emphasis added.]

---

**5.** Appellant's original counsel struck his appearance on August 10, 1989. Thereafter, between August 10, 1989 and June 5, 1990, ten motions to extend the time for filing briefs were filed by appellant. Nine were granted; the tenth denied. Thereafter, a new counsel entered his appearance resulting in a rescheduling of argument. The case was put on the summary docket in 1991, and our per curiam opinion issued on April 11, 1991, with the mandate issuing on May 13, 1991.

All of the delay was attributable to appellant.

Again, appellant made no direct objection to the trial court's characterization of the reasons for the setting of the trial date.

In *State v. Bailey,* 319 Md. 392, 572 A.2d 544, *cert. denied,* 498 U.S. 841, 111 S.Ct. 118, 112 L.Ed.2d 87 (1990), a period of two years and nine days elapsed between Bailey's arrest and trial. The Court initially noted, at 395–96, 572 A.2d 544:

> A defendant has no duty to bring himself to trial; the State has that duty as well as the duty of insuring that the trial is consistent with due process. Moreover, for the reasons earlier expressed, society has a particular interest in bringing swift prosecutions, and society's representatives are the ones who should protect that interest.

[*Barker v. Wingo,* 407 U.S. 514,] 527, 92 S.Ct. [2182,] 2190 [33 L.Ed.2d 101] [ (1972) ] (footnotes omitted). And it is also

> impossible to determine with precision when the right has been denied. We cannot definitely say how long is too long in a system where justice is supposed to be swift but deliberate. As a consequence, there is no fixed point in the criminal process when the State can put the defendant to the choice of either exercising or waiving the right to a speedy trial.

*Id.* at 521, 92 S.Ct. at 2187 (footnote omitted). Therefore, as *Barker* said at 522 [92 S.Ct. at 2188] "any inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case."

> The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice.

Bailey was initially arrested on February 14, 1986. A *nolle prosequi* was entered on June 6, 1986, on the subsequent indictment. In May of 1987, a grand jury reindicted him. He was brought to trial on February 23, 1988, over two years after his arrest. During part of this period, Bailey had been charged in South Carolina, tried there *in absentia,* and sentenced to ten years. In order to assist the South Carolina

authorities in obtaining custody of Bailey, the State originally entered a *nolle prosequi* for the Maryland charges. Bailey objected to this State's actions in assisting the South Carolina authorities.

The Court, in discussing the reasons for delay, made numerous observations, including: "To take but one example, the delay that can be tolerated for an ordinary street crime is considerably less than a serious, complex conspiracy charge," *id.* at 411, 572 A.2d 544 then, "Bailey was incarcerated in Maryland from about three months after his return until his trial. . . . [T]here was little incarceration for which Maryland was responsible. The weight to be given it in the prejudice factor is minimal," *id.* at 417, 572 A.2d 544. Commenting on a flat assertion that Bailey had lived with anxiety and concern, the Court stated that "[t]his bald statement . . . has little significance." *Id.* The Court, in response to Bailey's claim that his defense was impaired by the delay, opined, "[T]his amounts to a bald allegation, unsupported by evidence or sufficient proffer." *Id.* The Court then noted:

> As far as we can glean from the record, this is all that was before the court regarding the missing witness at the time the motion to dismiss was denied. In ruling on the motion, the judge, as we interpret the transcription of his comments, indicated only that some prejudice "possibly" arose from the claim as to the witness, but this was "contested by the State." The defense did not identify "Elliott" [the missing witness] with any particularity. His given name was not mentioned. His former address was not stated. The nature of his association with Bailey was not indicated. The particulars of his potential testimony were not proffered. There was no suggestion as to why he was no longer available or as to what steps had been taken to find him.

> It was not until the trial on the merits that we learn more about Elliott. William L. Moore was the co-defendant the State had persuaded to testify for the prosecution. On his cross-examination it was disclosed that Elliott's given name was Charles. . . . But Moore's testimony did not demonstrate how Elliott's testimony "could have provided testimo-

ny that was favorable to [Bailey] with regard to the nature and extent of [Bailey's] participation in this matter . . . ." In any event, it is obvious that Bailey's defense with respect to the transportation charge was not one whit impaired by the unavailability of Elliott to testify.

*Id.* at 418–19, 572 A.2d 544 (footnote omitted).

In considering the delay in bringing Bailey to trial under due process standards, the Court held, at 420–21, 572 A.2d 544:

The Supreme Court bespoke of the due process clause in *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455 [30 L.Ed.2d 468 (1971) ]. Although it appears that undue preindictment delay may invoke due process, there is clear indication *that due process is tied into actual prejudice for the clause to take hold.* The Court observed that the defendants in that case

rely solely on the real possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence be lost. *In light of the applicable statute of limitations, however, these possibilities are not in themselves enough to demonstrate that [defendants] cannot receive a fair trial and to therefore justify the dismissal of the indictment.*

*Id.* at 325–326, 92 S.Ct. at 466.

We have seen that, in the balancing process, despite the presumption of prejudice arising from the length of the delay, the scale tipped against Bailey and in favor of the State. We hold that the Due Process Clause was not violated. [Emphasis added.]

In *Carter v. State,* 77 Md.App. 462, 466, 550 A.2d 972 (1988), we said: "[T]he length of delay that will provoke such an inquiry is necessarily dependent upon the particular circumstances of the case . . . .". We also noted that "some delay between arrest and trial is necessary for preparation . . . ." *Id.* at 467, 550 A.2d 972 (citations omitted). We held that the defendant's speedy trial rights were violated in *Ferrell v. State,* 67 Md.App. 459, 508 A.2d 490 (1986), where a total of

eighteen months and twenty-six days elapsed between Ferrell's arrest and the original trial on the charges, at least thirteen months of which were directly chargeable to the State due to prosecutorial indifference. We did note, however, that for "a period of almost five months, the parties engaged in normal pretrial preparations. We regard this time as neutral. Consequently, it is not charged against either party." *Id.* at 463, 508 A.2d 490.

*United States v. Ewell*, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966), also involved a reversal and retrial. The facts there, however, indicated that the total time between the original arrests of Ewell and Dennis in December of 1962 and the date of the dismissal [6] was nineteen months; the original convictions were vacated on January 13 and April 13, 1964, respectively. They were then rearrested and reindicted. On July 13 and July 30, 1964, respectively, the federal trial court dismissed the new indictments on speedy trial grounds, *i.e.*, nineteen months had elapsed. In reversing the trial court, the Supreme Court opined:

> [T]he ordinary procedures for criminal prosecution are designed to move at a deliberate pace. A requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself.... "The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances...." "... The delay must not be purposeful or oppressive". "[T]he essential ingredient is orderly expedition and not mere speed."
>
> . . . .
>
> It has long been the rule that when a defendant obtains a reversal of a prior, unsatisfied conviction, *he may be retried in the normal course of events.* The rule of these cases, which dealt with the Double Jeopardy Clause, has been thought wise because it protects the societal interest in

---

6. The defendants' convictions were vacated due to an error in the indictment.

trying people ... rather than granting them immunization because of legal error at a previous trial....

> ... *But they urge us to prohibit prosecution ... because the passage of time has allegedly impaired their ability to defend themselves ... thereby rendering the delay prejudicial and oppressive.*

> ....

> ... *[A]ppellees' claim of possible prejudice ... is insubstantial, speculative....* They mention no specific evidence which has actually disappeared or has been lost, no witnesses who are known to have disappeared.... [I]t should be recalled that the problem of delay is the Government's too, for it still carried the burden of proving the charges beyond a reasonable doubt.

383 U.S. at 120–23, 86 S.Ct. at 776–78 (citations omitted, emphasis added, footnote omitted).

The defendant in *United States v. Rodriguez–Restrepo,* 680 F.2d 920 (2d Cir.1982), alleged that both her constitutional speedy trial rights and her rights to a speedy trial under 18 U.S.C.A. § 3161(h)(6) had been violated. The defendant was originally arrested on November 10, 1979. The indictment against her was dismissed on December 20, 1979, and she left the country. She was thereafter reindicted on February 22, 1980. Because she could not be immediately found, she was not arraigned on the charges until January 14, 1981, at which time she was directed to appear for a trial on February 6, 1981. As we have said, she moved for a dismissal on both statutory and constitutional speedy trial grounds. After addressing the statute,[7] the court discussed the constitutional speedy trial aspect:

---

7. The statute provided "that the trial of a defendant must begin within seventy days either from the date of the filing of the indictment or information or from the date the defendant appeared before a 'judicial officer of the court in which the charge is pending, whichever date occurs last.' " *United States v. Rodriguez–Restrepo,* 680 F.2d 920, 921 (2d Cir.1982) (quoting 18 U.S.C. § 3161(c)(1)).

Delay in this case was at most thirteen months, since the period from dismissal of the New Jersey indictment to reindictment ... must be excluded. Thirteen months, however, is far shorter than the delay in cases in which we have found no violation.

680 F.2d at 921 (citation omitted). The judgment was affirmed.

■ It is clear to us that, in the case *sub judice*, the trial court perceived that the initial delay in scheduling the retrial was caused by the court's uncertainty as to who would be representing appellant. The trial court then perceived that part of the delay was due to, *inter alia*, the filing of pretrial motions and the bond hearing (resulting in appellant's release on bond). It is further apparent that, during a conference held prior to April 15th, the parties were informed of, and apparently agreed to, a trial date of October 25th. In the absence of any indication in the record that appellant objected to that trial date, the trial court either properly believed it had, or assumed it had, appellant's consent. It was also to be understood that extra time was needed to prepare for trial in this case in light of the necessity for procuring transient witnesses who travel a racing circuit and, it was hoped, would be in Maryland in October.[8]

As we understand the trial court's decision, the delay in this case was attributed to all of these reasons, *i.e.*, (1) appellant's securing new counsel, (2) an agreement of the parties to a trial date, and (3) an appropriate period for trial preparation under the unique circumstances of this case. The trial court did not attribute any of the delay to the State. Under the circumstances of the case *sub judice*, we likewise attribute none of the delay to the State.

### The Defendant's Assertion of His Rights

We said in *Howell, supra*, 87 Md.App. at 85, 589 A.2d 90, what is equally relevant here:

---

8. Motions to compel the appearances of witnesses were filed in reference to witnesses believed to be in seven other jurisdictions.

Whether and how a defendant asserts his right is closely related to the other factors we have mentioned. The strength of his efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences. The more serious the deprivation, the more likely a defendant is to complain. The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right.

■ We shall consider appellant's assertion of his right in his favor. We note, however, as we do, even after this assertion, appellant failed to obtain the services of counsel for his third trial until February 2, 1993—two months and three weeks after the mistrial, and approximately two months and one week after the speedy trial demand was made. Additionally, as we have said, there was reason for the trial court to believe that appellant's counsel, on behalf of appellant, had agreed to the October 25th trial date. While we shall consider the fact that appellant made his speedy trial demands as a factor in his favor, it is somewhat tempered by the subsequent actions made on his behalf that indicated an initial approval, consent, or acquiescence to an October trial date.

### Prejudice

In our analysis of prejudice, we look only to the prejudice, if any, occurring by reason of the delay between November 12, 1992, and October 25, 1993.

Counsel, in his comments in respect to a speedy trial, *i.e.*, Sixth Amendment analysis of prejudice, informed the court that he was arguing the entire cumulative delay, as some of his statements reflect:

The Defendant remained incarcerated this entire time [from his initial arrest in 1987 until he was released on bond in the spring of 1993].... His bond originally was a million dollar[s].... So he was incarcerated continuously from October 10th, 1987 until April 28th, 1993....

. . . .

... I'd like to lay on the record some of the prejudice I think that the Defendant has suffered as a result of the lengthy delays in this case. First, ... he was incarcerated ... from October 10th, 1987 until April 28th, 1993.... He was nearly killed during riots at Hagerstown [prior to the mistrial].... He has certainly suffered anxiety and depression.... I will say that many of the witnesses ... are of a transit nature ... and are difficult to locate and time ... makes that ... more difficult.... [C]ertain evidence no longer is available to us, such as the vehicles.... [W]hether or not these two vehicles, impacted on that, ... without the actual vehicles, the Defendant is prejudiced in preparing his defense[9].... [A]dditional prejudice includes illnesses he's suffered while incarcerated.... [H]is driver's license, his social security and his green card ... he has not received those.

. . . .

... So, what I'm asking ... is to weigh all of this ... to consider ... the ... delay ... three years and nine months....

The State responded, in part, addressing a memorandum filed by appellant:

None of those cases [cited in appellant's memorandum] deal with this factual scenario [what is a speedy trial in a retrial setting][10] and ... there is no case I know of that would

---

**9.** Evidence from the vehicles of appellant and victim had been used in prior cases to establish contact and paint comparisons. The evidence was inculpatory, not exculpatory. That evidence was the bush guard and bumper from the victim's car and the bumper from appellant's car. These vehicular parts were made available to appellant at the third trial, as well as at the prior trials.

**10.** One such case was *Coleman v. State*, 49 Md.App. 210, 431 A.2d 696 (1981). It did not involve a mistrial but a remand after reversal. "It should be noted that this complaint is directed solely at the delay in appellant's retrial following our remand for that purpose...." *Id.* at 217, 431 A.2d 696. We then only considered the post remand period in our analysis.

adopt the cumulative test.... [I]t was known to the State that Allen Drieu would not continue as Counsel for the Defendant.... [T]he State waited for the appearance of new counsel....

....

... Your Honor, I would submit that the Defendant has not been prejudiced.... He has been released on bail in the spring of this year prior to this unusual situation of trying this case for a third time.

Appellant's counsel responded, restating his position that the prejudice was caused by the entire cumulative period: "Thirteen hundred and seventy-six days." Appellant's counsel continued:

I think that would be a reasonable way to approach it ... to look at the whole delay but to give the weight that the court feels it deserves to different periods. I don't think we can just ignore it and say that any delay was cured by a trial in the past....

The trial court then held that, even considering the cumulative delays:

[W]hatever ... the focus ... should be ... from the time of his arrest to October 25th [1993], or the time from the conclusion of trial two ... to October 25th, I don't find that the Defendant was denied his constitutional right to a speedy trial.

■ There was nothing contained in counsel's arguments as to prejudice before the trial court, except in generalized terms. Appellant did not clearly state how having both vehicles in their entirety was necessary; [11] he did not identify any particular witnesses whom he had been unable to obtain; he did not detail any unsuccessful efforts to obtain the attendance of witnesses; and he did not allege that any evidence had been destroyed (other than the cars) during the period of delay. During the period between mistrial and retrial, appellant was incarcerated for approximately five months before his release.

---

11. Other than saying that he wanted to measure the cars.

There were no specific factual allegations that his defense was inhibited during that five-month period of incarceration.[12] In his brief, appellant merely makes the same bald assertions and allegations he made below as to prejudice resulting from the cumulative delay.

While we do not hold that, in every conceivable circumstance, and in all cases of serial trials, only the last trial period will be considered in the prejudice prong of the *Barker* analysis, we do hold that, *in the absence of extraordinary circumstances,* we shall only look to the period between the next prior trial and a subsequent trial under the four factor *Barker* speedy trial analysis—*including the prejudice prong.* There is an element of prejudice in every prosecution. One of the State's intentions is to obtain a conviction. If successful, it is understood that a defendant may be prejudiced by loss of freedom or more. It is only improper prosecutorial conduct of a most egregious nature that would even give rise to an initial appellate desire to look beyond the trial at hand to the prior history of the case. That does not exist here.

We note, from the cases cited, that a certain period of time is necessary for normal trial preparation. There were no allegations made below, nor have any been made on appeal, of any extraordinary circumstances (other than the cumulative delay itself), such as intentional and grossly improper attempts by the prosecution to delay the trial for the purpose of inflicting improper prejudice upon the defendant. Although the Alabama intermediate appellate court found a twenty-one month delay between reindictment (the original indictment was quashed upon defendant's motion) and the trial to be excessive, it nevertheless affirmed the conviction in the post-*Barker* case of *Wade v. State,* 381 So.2d 1057 (Ala.Crim.App. 1980), *cert. denied,* 381 So.2d 1062 (Ala.1980), on the basis of an inadequate showing of prejudice. It opined:

---

**12.** His allegations of riots at Hagerstown and psychological problems related to the pretrial period before the first and second trials, not the period between the second and third trial.

[T]here is no suggestion of improper motive or conduct on the part of the prosecution.... Under these circumstances the new indictment gave rise to a new time period. Thus, ... we shall consider only the twenty-one month period between the reindictment ... and the trial.... "There is no fixed length of time that is considered to be per se unreasonable"....

....

... [T]here is no contention or suggestion that the delay was a deliberate attempt by the State in order to either enhance its own case or prejudice the defense.

....

... "(S)peculative allegations, such as general allegations of loss of witnesses and failure of memories are insufficient to establish the requisite actual prejudice." [*United States v.*] *Avalos,* 541 F.2d [1100,] at 1108 [5th Cir. (1976)]....

... [T]he failure of the defendant to know the whereabouts of these witnesses could just as easily be the result of the defendant's own negligence as the result of any delay which would be attributed to the State.

381 So.2d at 1059–61 (citations omitted).

As we perceive the period between mistrial and retrial, we do not discern any specific prejudice not associated with the normal retrial process. Appellant's general and unsubstantiated allegations of cumulative prejudice are insufficient.

### Conclusion

We conclude that, for all the reasons we have stated, appellant's constitutional rights to a speedy trial were not violated. Additionally, as we indicated, he had no statutory right to be tried within 180 days.

### II

### Admissibility of prior inconsistent statements of Henry A. Massey

The following relevant exchange occurred at trial during the cross-examination of Mr. Massey:

Q. ... [Y]our testimony today is that on weekdays ... the minimum amount of cash that Mr. Jerman would carry would be thirty thousand dollars?

A. That's correct.

. . . .

Q. Now, back in 1987, ... do you recall giving a statement to Detective Carl Layman?

A. I don't recall specifically.

. . . .

Q. [D]o you recall saying ... that ... Mr. Jerman may have at least fifteen thousand dollars in cash?

A. I may have said that he might possibly go as ... we usually always had at least thirty thousand dollars on us.

Q. So what you told Detective Layman was ... that the minimum was fifteen and not thirty?

A. Well I didn't say I told him that. I said I might have.

The judge then initiated a bench conference, during which the State objected to the defendant's line of questioning on the grounds that the method being proposed for impeachment was improper. Before the court could rule on the objection, appellant's counsel volunteered:

I'll tell you what, Your Honor, I'd be glad to recall Detective Layman in my case and question him about what this witness said to him on that issue. And that would mean that it wouldn't be necessary for me to actually show him the report and try to use it on him here, I'll just call, I'll recall Detective Layman when the time comes, in my case.

The court agreed with the appellant that it could do that which it said it had proposed.

[THE COURT]: It seems to me that would be ... appropriate....

. . . .

... [I]t seems to me that you [appellant's counsel] can produce Layman and indicate that what this witness said

was not correct. And Layman can relate to you what this witness told him.

[APPELLANT'S COUNSEL]: Right.

■ Viewing this exchange, we fail to perceive an appealable issue. The State objected and, before the court ruled, appellant informed the court that he was going to get to the testimony another way and the court agreed with appellant. The court did not err.

In *Watkins v. State*, 328 Md. 95, 99, 613 A.2d 379 (1992), a similar exchange occurred when, at the bench, appellant's counsel informed the court of his intentions:

DEFENSE ATTORNEY: Your Honor, I have information that Mr. Brown has a pending case that's a theft charge and he goes to trial on April 3rd.

THE COURT: Don't mention it.

DEFENSE ATTORNEY: The reason I'm saying that, I believe that I have a basis for thinking he may have been given some consideration in exchange for probation. I want to ask about the fact this happened.

PROSECUTOR: Your Honor, of course, that's exculpatory evidence and I certainly would have told [defense attorney] any deals that I had made with anybody that is testifying.

THE COURT: Alright.

DEFENSE ATTORNEY: Thank you.

(In open court.)

DEFENSE ATTORNEY: That's all I have.

The Court of Appeals then held:

Defense counsel clearly accepted the prosecutor's statement that no "deal" had been made with the witness, and acquiesced in the court's ruling. Accordingly, there is no basis for appeal from this ruling.

328 Md. at 100, 613 A.2d 379. There is likewise no basis to appeal this issue in the case *sub judice*.

### III

### The suppression of appellant's statements

 We have previously rejected appellant's contentions on this issue on his first appeal to this Court (No. 892, September Term, 1989, filed April 11, 1991 (Slip op. at 8.)). In the trial of the instant case, appellant merely renewed the same motions and offered no additional arguments and *no additional evidence or factual support.*

In *Channer v. State*, 94 Md.App. 356, 362, 617 A.2d 1092 (1993), we noted that, in a subsequent trial after a mistrial caused by a hung jury:

> At the first trial, defense counsel attempted to reopen the motion to suppress the statements but was not permitted to do so. After the first trial ended in a mistrial, defense counsel withdrew from the case and was replaced by new counsel. That counsel as well attempted to reopen the matter. At a hearing held prior to the second trial, the request was again denied.

We further noted, in reference to the statements suppressed in the first trial, that "[t]he trial court refused to reconsider the admissibility of those statements that were at issue in the original suppression hearing...." *Id.* We then held:

> The fact that a mistrial was declared at the close of the first trial did not nullify the pretrial hearing on the motion to suppress. *See Johnson v. State*, 67 Md.App. 347, 374–76, 507 A.2d 1134, *cert. denied*, 307 Md. 260, 513 A.2d 314, *cert. denied*, 479 U.S. 993, 107 S.Ct. 594, 93 L.Ed.2d 595 (1986) (a court presiding over the retrial of a defendant whose first trial ended in a mistrial did not abuse its discretion by refusing to rehear a motion to suppress evidence that was denied prior to the first trial). "When such a motion has been fully heard and considered and there is no new evidence which was unavailable at the first hearing, the trial judge may exercise his discretion and bind himself by the prior ruling...." *Id.* (quoting *Logue v. State*, 282 Md. 625, 628, 386 A.2d 780 (1978) (a court presiding over the retrial of a defendant who had been granted a new trial properly

refused to rehear a motion to suppress evidence that was denied prior to the first trial)).

*Id.,* at 363–64, 617 A.2d 1092.

In *Tu v. State,* 336 Md. 406, 648 A.2d 993 (1994) (*Tu II* ), a renewed suppression hearing was held below on the State's assertion that it had new evidence. The new evidence was heard and, at the second trial, a different result was obtained. The Court noted that Tu was arguing "the mandate rule": "When a case is appealed and remanded, the decision of the appellate court establishes the law of the case, which *must* be followed by the trial court...." *Id.* at 416, 648 A.2d 993. That Court noted the discussion in our *Tu II* (*Tu v. State,* 97 Md.App. 486, 498, 631 A.2d 110 (1993)), that, in ruling in the prior appeal, "[w]e did not declare the items to be inherently and generically inadmissible but merely inadmissible upon the circumstances presented to us in that case." 336 Md. at 417, 648 A.2d 993. In the case *sub judice,* appellant relied completely on the facts presented and arguments made in the first case. There is, thus, no exception to the law of the case, if it applies. The Court of Appeals, in its *Tu II* opinion, at 423–25, 648 A.2d 993, stated:

> Prior to the instant criminal cause, no Maryland appellate court in a reported decision has dealt with the interplay between suppression motions in criminal cases and the mandate rule subset of the law of the case doctrine....
>
> ....
>
> A number of this court's nineteenth century decisions contain statements to the effect that the mandate rule subset of the law of the case doctrine would not apply where the facts on remand are substantially or materially different from those before the appellate court on the first appeal.

The Court then held that the reconsideration in the subsequent case created no conflict with the law of the case doctrine because the previous case had only adjudicated issues then presented and the presentation of other issues on retrial was not prohibited thereunder.

In the case *sub judice,* the motion to suppress in the third trial was, by its terms, limited to the same reasons as the originally unsuccessful motion. That prior denial was upheld by this Court. Based upon the holdings of *Channer v. State, supra,* and the cases cited therein, which permit the trial court to refuse to rehear litigated suppression matters, and based on our *Tu I* and *Tu II* decisions, and the Court of Appeals's *Tu I* and *Tu II* decisions, we hold that the law of the case doctrine applies in the case *sub judice.* We perceive no error in the trial court's adherence to the previous rulings on the motion to suppress.

## IV

### Improper closing argument

Appellant furnishes excerpts from the State's argument that he considers as improper closing argument:

And I think it is important to make the distinction and the credibility of the evidence that was produced in this case by the State, versus the type of testimonial evidence and documentary evidence that was produced by the Defense. And perhaps you already sense the difference in the caliber of the cases that were proposed to you in this particular case.

. . . .

[T]he evidence that you have heard from the State has been detailed, it has been competent, it is unbiased as compared to the Defense's version as to what happened in this particular case.

. . . .

Mr. [J]erman was a remarkable man who lived until the end of his life fighting for his life, and that is not only an emotional appeal, I make to you, but a real appeal because is goes to the premeditation in his death by this man....

. . . .

And what she blurted out to you as well was that all the State's witnesses were lying. And I would submit to you,

how does she know that if she's supposed to be out in the hallway. And I would submit to you that she is lying and use your common sense. If your brother was on trial for murder, if your brother was accused of killing somebody on a particular date, and you claim to have been with him on that date, you are not going to not tell a police officer in this particular case. She can, despite her college education and long stay in this country, can get on the witness stand and pretend to be naive, but no credible, ethical lawyer told her not to say anything.

. . . .

I will submit to you there is no way the caliber of that Defense case in any way comes up and stands up to the State's case in this particular matter.

Appellant also asserts, without specificity, that the State personally attacked defense counsel by suggesting that counsel had deliberately misled the jury—that the State "knowingly interjected testimony that she knew was either false or unsupported by the evidence." Appellant alleges additional improper conduct.

Appellant interposed neither an immediate nor a belated objection, to any of the State's closing argument, asked for any curative instructions based thereon, or requested a mistrial because of it. This issue is not, therefore, clearly preserved for appeal. Md.Rule 8–131, Md.Rule 2–517(c).

Nevertheless, because of the extended history of this case, we shall address the issue, choosing to err, if at all, on the side of caution, in an effort to achieve a final resolution in this case.

Generally, in closing argument, counsel may "state and discuss the evidence and all reasonable and legitimate inferences which may be drawn from the facts in evidence. . . ." *Wilhelm v. State,* 272 Md. 404, 412, 326 A.2d 707 (1974). Counsel is afforded wide latitude in summation. *Id.* While counsel's arguments must be confined to the issues on trial, the evidence and all fair and reasonable deductions therefrom, and arguments of opposing counsel, liberal freedom of speech is generally allowed. *Id.* at 413, 326 A.2d 707. A

limitation on the general scope of permissible closing argument regards not allowing counsel, over objection, to comment on facts not in evidence or state what could be proven. *Id.* It is to be remembered that the conduct of a trial rests largely in the control and discretion of the trial judge, and an appellate court will not interfere therewith unless there is a clear abuse of discretion. *Id.* It is our view that the prosecutor's response to defense's closing argument was "fair rebuttal." *See also Booth v. State,* 327 Md. 142, 197, 608 A.2d 162, *cert. denied,* —— U.S. ——, 113 S.Ct. 500, 121 L.Ed.2d 437 (1992). We perceive no error.

## V

### Motion *in limine*—motion to dismiss for destruction and loss of evidence

During appellant's argument on this same issue in the second trial, the following occurred:

MR. DREW [APPELLANT'S COUNSEL]: ... [T]he Motion to Suppress Evidence [is] still [a] viable motion[ ] in this particular case. We are going to rely on the initial motions that were filed.... We would be proceeding on the basis of that and ... the vehicle itself.... [O]ne of the bits of evidence that ... was in the custody of the State was a portion of the ... Datsun.... [T]he only physical ... evidence ... that I was able to find was the bumper from the Ranchero.... [W]e would like the opportunity if they [parts of the Datsun] are [available], to examine them....

. . . .

MS. O'DONNELL [STATE'S ATTORNEY]: I spoke to Mr. Drew ... on August the fourteenth at which time he asked me to produce ... if I could, the Datsun pick-up truck that was owned by the victim.... [T]he truck ... had been given to a wrecker to be junked. Any pieces of [it] that are not in evidence ... are in the possession of the Howard County Police Department, I certainly have no objection ... to Defense Counsel seeing it.

. . . .

The State's Attorney's Office is not in possession of any portions of either the Ranchero automobile or the Datsun pick-up truck....

MR. DREW: Your Honor, we may be able to resolve that amongst ourselves, I'm not going to bring the Court into that but ...

There was then a discussion between the parties and the court in reference to the suppression of the statement. There was also discussion in reference to whether the arrest warrant and the subsequent seizure of appellant's vehicle had been appropriate due to alleged improprieties in the supportive statement given by the officer. The hearing then continued:

MR. DREW: ... [W]hen I initially started out, one of the things that I said may or may not be a potential issue and I really don't know whether it is at this point is that some parts of the ... vehicle driven by the Decedent ... are not present.

....

MS. O'DONNELL: ... [T]he only thing I was aware of that Mr. Drew wanted to see was the truck.... [It] no longer exists.

THE COURT: ... [S]ome parts may have been removed ... and were not included ... in evidence at the ... [prior trial] so if they can be accounted for, that's what you would like to see?

MS. O'DONNELL: If they're in the property room ... Mr. Drew can see those.

THE COURT: ... [I]f you're willing to do that without a[ ] motion and an order, that's fine....

MR. DREW: Either that or I can arrange to pick them up from the State's Attorney.

THE COURT: ... [T]hat's fine.

Another extensive discussion then ensued between the parties and the court in respect to the arrest warrant and statements. The State argued that the issue of the admissibility of the items seized from appellant's trunk had been previ-

ously resolved by a ruling in the prior trial. Appellant's counsel then again referred to the decedent's vehicle:

MR. DREW: ... I spoke with Ms. O'Donnell concerning the idea of examining the vehicle of the Decedent ... as well as parts ... I was told ... that at least one or more parts ... are available in the evidence room ... or ... at the Police Department.... [T]he vehicle itself was returned to family members of the victim and has ... been ... trashed....

Appellant then moved to suppress all the evidence originally generated from the examination of the vehicle and the parts removed therefrom and preserved for trial, arguing that:

The basis for my motion is ... that much of the information that the expert used ... concerning physical damage to the vehicle of the victim in relation to the Defendant's vehicle was based on measurements taken.... I'm suggesting again that we are now entitled because we do have a fresh slate—

THE COURT: I would actually think that [the] magnitude of your motion is such that it compels itself to [be in] writing.

MR. DREW: I don't want to lose the issue ... I will submit that in writing....

THE COURT: Now, testimony concerning that item was presented in Court in trial number one?

MR. DREW: That's correct sir.

. . . .

THE COURT: The subject of Mr. Webb's examination of testimony was a part of the vehicle and that part is no longer available. Is that what you're telling me?

MR. DREW: The whole vehicle is not available. He used ... measurements that were taken [off] the vehicle ... I am entitled at this point in time to do that examination—

THE COURT: Well you could have been....

. . . .

THE COURT: ... [I]f you can find me any case with legal authority....

MR. DREW: Very well, I'll file such a motion.

The State subsequently responded:

MS. O'DONNELL: ... I was not aware that Mr. Drew, nor has any other Defense Counsel on behalf of Mr. Icgoren since the first trial sought to see the Datsun pick-up truck that was released to the victim's surviving son.

THE COURT: ... [T]here was a raft of lawyers for the Public Defender's Office and investigators and independent examiners all available to [the defendant] throughout the period of time when the vehicle was indisputably in the custody of the State and ... available for inspection and analysis by the Defense....

....

MS. O'DONNELL: ... [T]he order of Judge Fischer dealt with the destruction ... of ... notes, reports ... and police notes....

....

MS. O'DONNELL: ... Portions of the truck that were seized and used as evidence have been maintained.

It was then agreed that appellant's counsel would file a written Motion to Reconsider in respect to the missing vehicle and other matters in order to explain fully the nature of his objections. Our review of the record forwarded to this Court fails to reveal that any written motion was ever filed in that second trial; nor was any further action on the verbal motion taken at that time, either by appellant or by the trial court.

Subsequently, but sometime before or during that prior trial, appellant argued a verbal motion *in limine* to preclude the prosecution's inquiry into, or introduction of, his cocaine use, financial condition, and certain hearsay matters. The court asked appellant's counsel, "Those are the three subjects?" Mr. Drew responded, "Those are the three subjects." Appellant's counsel did not accept the court's invitation to expand the motion *in limine* beyond the three areas specifical-

ly addressed, to encompass the arguments previously made about the items removed from the vehicles.

In arguing at the motions hearing prior to the trial *sub judice*, appellant's new counsel stated:

There ... are a couple of things, however, that I would like to raise. One of them ... has already been ruled upon by a prior Judge in this case.... [As] you know, ... certain items ... o[f] evidentiary value are now missing ... including ... the victim's vehicle ... parts of that vehicle were retained, I believe the bumper because there's ... alleged to have been a contact between the defendant's vehicle and the victim's vehicle. However, the actual vehicles are no longer available. There was a motion made by prior Counsel [in the second trial] regarding dismissal for destruction of evidence. I don't think there's anything the State can do now about leading up to a vehicle that no longer exists, *I just mention that as, on behalf of my client. The, what the State may be able to help u[s] with, however, is, we've requested help in locating an officer who is named Robert Myers....* He ... conducted a polygraph test on a Mark Anthony Brown [an] ... early ... suspect.... [Emphasis added.]

The State responded, in relevant part:

We never maintained control over it [appellant's car], just as we have never maintained control of the Datsun.... [T]he pickup truck ... was never held as evidence ... only portions of it were.... [I]t was never kept in evidence.

We fail to perceive, based on appellant's argument in the instant case, that, as to the vehicle, he was doing anything other than informing the court that the vehicle was not available. We do not discern in that exchange any request for the court to act. Later, the court, nevertheless, reaffirmed the order of the trial court in the prior case. As we perceive the court's action on that prior motion in the second trial, it was denied at the initial oral argument. That denial, however, was made in expectation that the issue had not been resolved and that appellant was to offer further support by way of a

Motion to Reconsider in order for the prior court to reconsider the matter. In other words, the prior resolution was based upon that court's willingness to give further consideration to appellant's argument if appellant filed a Motion to Reconsider with citations of legal authority in support thereof. As previously stated, our review of the record in that proceeding does not reveal any subsequent written Motion to Reconsider.

In any event, however, it is clear that the State did not have, and, as far as the evidence contained in the record before us reflects, never had, the automobile at issue, or control over it at any time relevant to the trial *sub judice*. It had possession and control of the bumper, which remained available at all times. Appellant's prior counsel was fully apprised, in 1992, before the second trial, of the fact that the State did not have, and had not had, for some time, control of the vehicle *per se*. The record further reflects that the motion to preserve evidence filed at the conclusion *of the first trial* related only to statements and notes of various officers—not to the vehicles. Moreover, counsel's arguments in the present trial may not, as we perceive it, suffice to raise again this twice resolved issue.

We shall, however, as we did earlier in respect to issue IV, given the protracted history of this case and for the reasons we earlier stated, address the issue as if it were preserved.

We first note what we recently said in *Tu v. State*, 97 Md.App. at 495–97, 631 A.2d 110, regarding limitations on the applicability of the law of the case in criminal cases:

[T]he Court [of Appeals] has made clear that the doctrine applies only where the facts upon which the first appellate decision was premised are substantially the same as those produced upon remand.

. . . .

... The "law of this case" doctrine does not preclude reconsideration of an issue decided in an earlier appeal if the evidence on remand is substantially different.

The second trial ended in a hung jury and a mistrial. Thus, there was no *appellate* ruling arising out of that trial in

respect to this issue. Additionally, this issue was neither presented to us nor addressed by us in our reversal of the first trial. Thus, there is no "law of the case" issue presented here.

 There is no allegation of any deliberate attempt by the State to cause the vehicle to be unavailable. We have found nothing in the record before us that indicates that the vehicle was not equally available to both the State and defense during the earlier proceedings. The State, at or before the first trial availed itself of the opportunity to inspect the vehicle; apparently, the defense did not.

Moreover, there was never, as far as we can discern from the record before us, any indication that the State knew of any exculpatory evidence, or, in fact, that any exculpatory evidence was contained in or on the vehicle or could have been developed from an examination thereof. The evidence reflects that, at a prior trial, the State informed the defense of the then whereabouts of the two vehicles. As we have stated, based upon the lack of any indication to the contrary in the record, we are not aware that the defense ever conducted any examination of the vehicles.

We discussed limitations as to the applicability of *Brady* [13] in *Tolen v. State,* 59 Md.App. 625, 630, 477 A.2d 797, *cert. denied,* 301 Md. 639, 484 A.2d 274 (1984), where a crisis center had inadvertently destroyed a victim's blood and fluid specimens (in a rape case) after the defense's request that it be preserved:

> The heart of the *Brady* decision was that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is *material either to guilt or to punishment.*" 373 U.S. at 87, 83 S.Ct. at 1196[–1197]. In explicating *Brady, Moore v. Illinois,* 408 U.S. 786, 794–795, 92 S.Ct. 2562, 2567–2568, 33 L.Ed.2d 706, 713 (1972), pointed out the three distinct components, all of

---

**13.** *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

which are necessary to the finding of a due process violation:

> "The heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence. These are the standards by which the prosecution's conduct ... is to be measured." [Emphasis added.]

We added:

> In terms of what is "suppression," moreover, *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342, 349 (1976), characterized *Brady* as involving "the discovery, after trial, of information which had been known to the prosecution but unknown to the defense." What the unanalyzed blood specimen in this case might have revealed was no more known to the State than it was to the defense. There is no remote suggestion that the State feared what the undone analysis might have revealed and, therefore, deliberately chose not to know.
>
> Before a finding can be made that there has been an unconstitutional suppression, furthermore, there must be a subfinding as to "the evidence's favorable character for the defense." *Moore v. Illinois*, 408 U.S. at 794–795, 92 S.Ct. at 2567–2568. We have no way of knowing whether the unanalyzed blood sample, even in a peripheral way, would have been favorable to the defense or not. In pointing out that mere uncertainty or speculation as to the quality of the "lost" evidence does not satisfy the rigorous requirements for a finding of unconstitutionality, *United States v. Agurs*, *supra*, at 427 U.S. [at] 109–110, 96 S.Ct. [at] 2400–2401, pointed out:
>
> > "The mere possibility that an item of undisclosed information might have helped the defense, or might have affect-

ed the outcome of the trial, does not establish 'materiality' in the constitutional sense."

It is also required that the evidence in question be material. Generally speaking, this requires that the evidence be directly exculpatory and not of mere utility for impeachment purposes. As the Court of Appeals pointed out in *State v. Giles*, 239 Md. 458, 469, 212 A.2d 101 (1965), *vacated on other grounds*, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967):

> "Not only must the evidence withheld be admissible and useful, but it must be such, if it had been offered in evidence, as would be capable of clearing or tending to clear the accused of guilt—*i.e.*, it must be exculpatory."

*Id.* at 631–32, 477 A.2d 797.

The record does not reveal that any request to inspect the entire vehicle had been made prior to its return to the victim's family. At the time appellant first asserted a right to inspect the vehicle, as we perceive from the record before us, the State had no more control over the vehicle than did the defense. Moreover, no sufficient proffer was ever made of what the defense hoped to develop if, in fact, the car had not been discarded. The mere fact that, as, at some point, was alleged, appellant wanted to conduct measurements it deemed important is not a sufficient proffer of the materiality of that which appellant was seeking.[14] We hold that the vehicle in question was, therefore, not *"suppressed"* in a *Brady* sense by the State. For all of the reasons we have stated, we see no error on this issue by Judge Kane.

### Conclusion

As should be apparent, Judge Kane was called upon to make numerous rulings on complicated legal issues. He dis-

---

**14.** In the present appeal, appellant asserts that he wanted to compare the height of the two bumpers as well as to analyze paint scrapings. Appellant did not direct our attention to where, in the various transcripts forwarded to us, such a proffer was made to the trial judges. We did not see that representation made in our review of the transcripts of the motions hearing before the present judge or the judge at the second trial.

played an accurate understanding thereof and resolved them by a proper application of the law to the facts before him. He committed no reversible error in this well-tried, complicated case. As Judge Kane hoped that someone would be interested in his comments about appellate delay, we hope that he is interested in our comments as to the trial he ably conducted.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**